## WYLIE *v.* NORTHAMPTON BANK.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

Argued November 24, 1886. — Decided December 13, 1886

The robbery by burglars of securities deposited for safe-keeping in the vaults of a bank is no proof of negligence on the part of the bank.

It is competent for a national bank to take steps for the recovery of its property stolen by burglars, and to agree to take like steps for the recovery of the property of others deposited with it for safe-keeping and stolen at the same time; and want of proper diligence, skill, and care, in performing such an undertaking is ground of liability to respond in damages for failure: but the evidence in this case failed to establish either such an agreement, or the want of diligence and care, and the jury was properly instructed to return a verdict for defendant.

This was an action against a national bank to recover the value of certain securities deposited in its vaults, and stolen therefrom by burglars. The case is stated in the opinion of the court.

*Mr. George H. Adams* for plaintiff in error cited: *National Bank* v. *Graham*, 100 U. S. 699; *Whitney* v. *Bank*, 1 Morrison's Transcript, 263; *S. C.* 50 Vt. 388; *Wiley* v. *Bank of Brattleboro*, 47 Vt. 546; *Baylis* v. *Travellers' Ins. Co.*, 113 U. S. 316, 320.

*Mr. William G. Peckham* (*Mr. Eliphalet Williams Tyler* was with him on the brief) for defendant in error cited: *Allegheny County Workhouse* v. *Moore*, 95 Penn. St. 408; *Chemical Bank* v. *Kohner*, 8 Daly, 530; *Bright* v. *Metarie Cemetery*, 33 La. Ann. 58; *Foster* v. *Essex Bank*, 17 Mass. 479; *S. C.* 9 Am. Dec. 168; *McLemore* v. *Louisiana Bank*, 91 U. S. 27; *Claflin* v. *Meyer*, 75 N. Y. 260; *First Nat. Bank* v. *Ocean Bank*, 60 N. Y. 278; *Dudley* v. *Scranton*, 57 N. Y. 424; *Parker* v. *Rensselaer & Saratoga Railroad*, 16 Barb. 315; *Delevan* v. *Simonson*, 35 N. Y. Superior Court, 243; *Ross* v. *Mather*, 51 N. Y. 108.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

This was an action in law originally commenced by the plaintiff in error in the Superior Court of the City of New York, and removed by the defendant into the Circuit Court. The complaint alleged, that, on the 26th day of January, 1876, the plaintiff was the owner of eight first mortgage bonds of the Pacific Railroad Company of Missouri, for $1000 each, with coupons attached, which, at that time, were in the custody of the defendant for safe-keeping under an agreement by which the defendant agreed to keep the same safely and deliver them to her upon demand, but that on that day the defendant's bank was broken into by burglars and a large amount of property taken by them therefrom, amounting in value to over $1,600,000, consisting chiefly of bonds, stocks, and other similar securities, with some money, the property in part of the bank and of others, and including the plaintiff's bonds and coupons; and it is averred that the said loss by robbery occurred in consequence of a want of due care on the part of the defendant.

It is further alleged by the plaintiff, that, shortly after the said loss, "the plaintiff was intending and was about to enter in good faith upon negotiations and to take measures for the recovery of her said bonds and coupons from whomsoever then possessed the same; that thereafter, and about the time last mentioned, the defendant represented to the plaintiff that

·the defendant was about to take measures for the recovery of the property so taken, and expected to recover all of said property in bulk, or the greater part thereof, from the persons taking the same as aforesaid, by means of rewards and other measures, and was undertaking, or about to undertake, negotiations with said person or persons, to the plaintiff unknown, for accomplishing the same; and the defendant then further represented, that it expected to receive such restoration if it was allowed to act therein in behalf of the plaintiff and in behalf of other depositors and losers who were in the same position as the plaintiff; and the defendant further represented, that it, the said defendant, was in a better position to negotiate for the restoration of said property as aforesaid, and could accomplish the same at less expense, than if the plaintiff and other individuals, owners and losers of said property, were to act in that respect independently.

"That thereupon, and at or about the time last stated, the defendant requested the plaintiff to permit and authorize the defendant to act for her and in her behalf in the respects mentioned, and in such negotiations, for the recovery of her said bonds and coupons, with the bonds, stocks, securities, and other property of the defendant and other owners and losers of property as aforesaid; and further requested the plaintiff not to undertake negotiations with, or offer rewards or other inducements to the persons who had taken or were in possession of said bonds or other property as aforesaid, for the return of the same.

"That thereupon, and relying upon such representations and all of them, the plaintiff complied with such requests of defendant, and did not undertake negotiations with or offer rewards or other inducements to such persons as aforesaid for the return of her said bonds and coupons, and permitted and authorized the defendant to act for her and in her behalf in the respects mentioned, and as requested in such and any negotiations for the recovery of her said bonds and coupons, with the bonds, stocks, securities, and other property of the defendant and other owners and losers of said property as aforesaid.

"That thereupon the said defendant undertook to act in behalf of the plaintiff in the respects mentioned, and took certain proceedings and entered into certain negotiations with the persons who had taken said property or possessed the same as aforesaid, for the recovery of the same; that some time during the years 1879 and 1880, the defendant, acting as aforesaid, recovered and received from said persons the greater part of said stolen property, taken, as aforesaid, on the 26th day of January, 1876, including a large amount of the separate property of the defendant, amounting in all, in face or par value, to about $1,500,000; and thereupon the defendant settled and compounded with said persons for all claims arising or growing out of such taking or robbery as aforesaid.

"That the difference between the amount of property so recovered, and the amount of property taken or stolen on January 26, 1876, as aforesaid, and all the property so taken and not recovered, was by the defendant allowed and agreed to be retained by and released to the said persons as a consideration or reward for the restoration of the remainder, as aforesaid. That among the securities and property so allowed and agreed to be retained and so released by the defendant were the eight bonds of the plaintiff and all the coupons thereto belonging. That the plaintiff was not informed at the time by the defendant of the terms of said agreement or arrangement between the defendant and said persons, but all the proceedings of the defendant in those respects and for the restoration of such property were concealed from the plaintiff, and she has never consented to the action of the defendant therein.

"That by means of plaintiff's said property, together with other considerations, and by the total sacrifice of the plaintiff's said property, the defendant was enabled to recover, and did recover as aforesaid, a large amount of its own property and the property of its other depositors, and has reimbursed itself for the greater part of its losses in said robbery and for the expenses which the defendant incurred in respect to the matters herein mentioned.

"That the defendant, not regarding its promises and under-

takings, did not take due care of the plaintiff's interest as aforesaid, but, on the contrary, sacrificed the same for its own advantage, and so negligently and carelessly conducted itself with respect to the plaintiff's said property and interest, and took so little care thereof, that, by and through the mere neglect and improper conduct of the defendant and its servants, and by the wilful neglect of plaintiff's said interests so committed to its charge, the plaintiff has wholly lost her said property," for the value of which she accordingly asks judgment.

To this the defendant answered, admitting that securities to the amount in par value of about $1,600,000, belonging in part to the defendant and partly to its officers and other persons, were stolen from its vaults by armed burglars in January, 1876, and that among said securities were the bonds claimed by the plaintiff as plaintiff's property. The answer alleges that the bonds of the plaintiff, prior to the burglary, were held by the defendant in its vaults as a favor to the plaintiff, by permission of one of the defendant's officers, without the consent or agreement of the defendant, and were not on deposit with the defendant for any reward or consideration to the defendant, but were left on the special agreement made with the plaintiff that the bonds should remain at the risk of the plaintiff, and the defendant should in no case be responsible therefor; and alleges that it had no corporate power to make any contract or agreement, either with reference to the safe-keeping of the said bonds, or any such contract as that alleged in the complaint for their recovery, and that no such contract was in fact ever made, all the allegations of the complaint in that respect being denied. The answer further alleges, that the defendant, "while having no duty or obligation to the plaintiff in the premises, nevertheless did use good faith and due care in all the transactions mentioned in the complaint, and the defendant committed no breach of trust, and was guilty of no breach of trust, fraud, carelessness, or negligence whatever in any or all of said matters; but, on the contrary, defendant alleges, that, at its own expense, defendant enabled plaintiff to recover four of the eight

bonds, for the value of which plaintiff here sues defendant;" and that the plaintiff's failure to recover back the remaining four of the eight bonds was caused solely by the carelessness and negligence of the agents employed by the plaintiff and not by the defendant.

By a pleading subsequently filed, and called a replication, the plaintiff admitted that since the commencement of the action she had recovered four of the bonds mentioned in the complaint by means of an action of replevin against one Henry G. Pearson, then the postmaster of the city of New York, and reduced her claim accordingly.

The cause came on for trial by a jury, and the plaintiff, having introduced evidence to maintain the issues on her part, rested her case, when, on a motion of the defendant, the court instructed the jury to return a verdict for the defendant, which was done. Judgment was rendered thereon in favor of the defendant, to reverse which this writ of error is now prosecuted.

The question of law for our determination, is whether there was sufficient evidence in support of the plaintiff's cause of action to require its submission to the jury.

The evidence offered by the plaintiff on the trial of the cause tended to prove the following facts:

The burglary occurred in January, 1876. Efforts were immediately made by the bank to recover the lost property; and, about three weeks after the burglary, the officers and directors of the bank caused a meeting to be held at the bank, of some of the losers, including depositors for safe-keeping. Plaintiff did not attend this meeting, and it does not appear that she was represented there. At that meeting directors and officers of the bank were present, and it was proposed to form a committee composed of bank officers and depositors to take measures to recover the stolen property. This was assented to by the bank's officers, but was voted down, and the matter left, as before, to the efforts of the bank.

In 1877 the plaintiff in error married Dr. Wylie, of New York, who thereafter acted for her in the matter. In the same year Dr Wylie was informed, through a patient, that he

could deal with Scott, one of the burglars, for the recovery of Mrs. Wylie's bonds. He did not at once act upon this, because he understood the bank was acting for his wife. Shortly thereafter, Dr. Wylie stated this proposition to Warrener, the vice-president and manager of the bank, and that he thought he could get back his wife's bonds. Warrener then requested Wylie not to negotiate independently of the bank, and stated that the bank was negotiating to get the securities back. To this request Wylie acceded.

On February 9, 1878, Wylie received from Hinckley, one of the prominent directors of the bank, a letter representing that he was acting for the bank, and enclosing the following paper, which he requested the plaintiff to sign :

"We, whose names follow, having suffered the loss of securities by the robbery of the Northampton National Bank in January, 1876, hereby agree to pay a pro rata proportion of the expenses incurred in obtaining them and returning them to us."

Hinckley wrote again, February 27, 1878, as he says, at the request of Warrener, and Edwards, the president, urging Mr. Wylie to sign the paper, and saying that they thought the property could be recovered "cheaper in bulk than in detail," and that they had "strong hopes of being able to effect a negotiation at no distant day, and would like to make one clean job of it." Thereupon, on March 21, 1878, Mrs. Wylie and her husband signed the paper as requested, and returned it to the bank.

In October, 1877, Edwards, the president of the bank, was notified by persons acting in behalf of Scott and Dunlap, two of the burglars then under sentence, that $100,000 of the best bonds had been put aside and money borrowed on them, and that the whole lot could be had for $8000; whereupon efforts were made to effect this recovery. To the knowledge of Edwards and the vice-president, Warrener, and upon consultation with them, Hinckley was allowed, however, to separately negotiate, through the same channel, for the return of $25,000 Union Pacific Railroad bonds, which were known to belong to him, on payment of $6000. These $25,000 of bonds were

a part of the $100,000 lot, and upon delivery were locked up, and the transaction concealed until June, 1878. After the $6000 was paid, the difficulties of negotiation increased, the persons holding the balance of $75,000 making exorbitant demands. While further negotiations for the $75,000 were proceeding, Hinckley, though acting as an officer of the bank for all parties concerned, and acting with Edwards and Warrener, again attempted to make his private bargain for $19,000 more of Union Pacific bonds supposed to be in the same lot. The return of the $19,000 was offered upon payment of $10,000 to the parties holding them; which offer was refused, the price being considered too exorbitant. Further attempts were made to secure the return of the remaining $75,000, but the holders of the securities refused all offers made for their return, and the whole $75,000 were sent to Europe and negotiated or otherwise lost. On this subject, Hinckley wrote to Dr. Wylie on May 10, 1879: "This I do know, that . . . no part of the $75,000 left the country until some time in 1878, after I refused to pay $10,000 for the balance, $19,000, of my U. P.'s. It was my refusing to pay that sent them abroad. If I had accepted the offer, I have no doubt we could have got the whole $75,000 at 50 per cent. of the market value." Hinckley also wrote to Dr. Wylie: "The offer was a specific one for $25,000 U. P. S. F. bonds. It came from the thieves, not from me, or any one in my interest. If the offer had been to return the Missouri Pacifics, you would have been notified, and not I. Every effort was made to induce the holders to name a price at which they would return the $100,000, but to no purpose, although I have good reason to believe that if I had accepted the second offer of 50 per cent. of the market value, something might have been done."

In January, 1879, Dr. Wylie notified various bankers abroad of the theft of the bonds, and subsequently certain of the coupons from said bonds were presented for payment, of which the plaintiff was notified by the railroad company, and she replevied and recovered the same. It was then ascertained for the first time, in June, 1879, that the bank had not sent particulars of the robbery abroad further than that the

robbery had occurred, and such a list of bonds stolen, but the numbers of the bonds were not given; some circulars giving the numbers of the bonds and a general cable were sent to London, but no circulars were sent to Frankfort or elsewhere on the Continent.

In 1876 and 1877 indictments were found in Massachusetts against Scott and Dunlap, and also against Leary, Conners, and Draper, for this burglary. Scott and Dunlap were tried and convicted at Northampton; the others had not then been caught. Afterwards Draper was arrested and taken to Northampton, and remained there in jail untried about two and one half years; shortly before the expiration of which time, in 1880, Conners and Leary were arrested and taken to Northampton jail. Negotiations were conducted between the bank and Scott and Dunlap, then in State prison, and influence brought to bear upon them for the return of the property, and they finally stated to one of the directors that Leary had control of it. After Leary was arrested, Scott and Dunlap wrote a letter to him, which resulted in the greater portion of the property being recovered soon after Conners was taken to Northampton. Hinckley and Warrener went to New York to a safe deposit company there and brought it away. A little before or after this final recovery, Conners, Leary, and Draper were all discharged at Northampton without trials. The amount of property stolen was recovered, except about $12,000 cash and $70,000 to $80,000 par value of bonds and securities. The bulk of the negotiable coupon bonds were recovered; also all non-negotiable bonds, and all negotiable securities except about $80,000.

Hinckley testified that a final recovery was not made by or through him, and not by or through the means mentioned in the 1878 and 1879 letters to Wylie. Everything was futile until the final recovery. The bank or its officers did not agree that the plaintiff's bonds should be retained and released to the thieves, or any other person, as compensation for the restoration of the remainder. Of the coupons attached to the plaintiff's stolen bonds maturing prior to the commence-

ment of this action, twenty-eight have been recovered. These coupons were each for $30.

The value of the plaintiff's bonds, on January 31, 1882, was $1080 for each bond, with unmatured coupons only attached. Of the plaintiff's bonds so stolen, four have been recovered by her.

The complaint in this case may be considered as embracing two distinct causes of action: the first, founded on the alleged negligence of the defendant in the original loss of the bonds, and the second, on negligence alleged to have occurred in the execution of the agreement for their recovery. It was decided in the case of *National Bank* v. *Graham*, 100 U. S. 699, 704, that it would "be competent for a national bank to receive a special deposit of such securities as those here in question, either on a contract of hiring or without reward, and it would be liable for a greater or less degree of negligence accordingly." In the present case, it is conceded that there is no evidence of negligence on the part of the bank resulting in the original loss by robbery, except the mere fact of the loss itself by that means. The plaintiff's case, therefore, upon this cause of action is without proof.

As to the second cause of action, the facts stated in the complaint seem to us to be sufficient, if proven, to constitute a legal liability on the part of the defendant. It would certainly be competent for a national bank to take measures for the recovery of its own property lost in the way described. If the loss, as in the present case, included the property of others, and it was deemed best, having reference to the bank's own interest, that these measures should be taken by the bank alone for itself and all concerned, it might lawfully undertake to act for others thus jointly concerned with itself as well as for itself alone; and want of proper diligence, skill, and care in the performance of such an undertaking would be ground of liability, to respond in damages for such failure. Much more would the bank be liable, in such a case, if, in the performance of such an undertaking, it used the property of the plaintiff for the recovery of its own. This, it is alleged in the complaint in this case, the defendant did. There is a total

want of evidence to this effect, and that ground of complaint was very properly abandoned.

The plaintiff, therefore, must stand upon the remaining allegations, which may be reduced to two : 1st, That the bank did make such an agreement to act as the plaintiff's agent in the recovery of her property; and, 2d, That it was guilty of a want of due care and diligence in the performance of its duty as such, whereby the loss occurred. On both of these points we think there was no evidence to charge the defendant sufficient to require it to be submitted to the jury. The meeting referred to in the evidence, called by the bank, of those interested with itself in the recovery of the stolen property, resulted in no such agreement. The bank had before that been taking such measures for that purpose in its own behalf, and incidentally for the others, as it deemed best. The proposal made at the meeting to put the matter in charge of a joint committee of the officers of the bank and individual losers was rejected. The bank continued thereafter to prosecute the matter as it had been doing from the beginning. The communications which subsequently took place between Dr. Wylie, the plaintiff's husband, and Mr. Warrener, the vice-president and manager of the bank, based on the information which the former had received from his patient, that he could deal with Scott, one of the burglars, for the recovery of his wife's bonds, and the reply made by Mr. Warrener requesting him not to institute an independent negotiation, on the ground that it might interfere with the success of those which the bank was then prosecuting, do not tend to prove a contract by which the bank assumed to act as the plaintiff's agent in the matter, which bound the bank to take any other measures than such as it was then pursuing, or which obliged the plaintiff not to undertake any separate negotiations of her own. At the most, it can be considered only as a friendly understanding, between two parties having like interests, in respect to the course deemed best for the interests of both.

But, even if it could be supposed that there was proof of a distinct agreement, such as is alleged, whereby the bank agreed, in consideration of the plaintiff's desisting from any

separate efforts on her own behalf to prosecute measures for recovery of her property equally with that of the bank and others, there is still an entire failure of evidence to establish, as against the bank, any failure of performance on its part. It seems to have acted with promptness, with diligence, with skill, and with success. The great bulk of the stolen property was in fact recovered through its exertions and instrumentalities. This recovery included one half in number of the bonds lost by the plaintiff, and no part of the plaintiff's property was used or sacrificed to save what was secured.

The particular circumstances in regard to the recovery by Hinckley of his Union Pacific Railroad bonds, which seem to form the chief matter of complaint on the part of the plaintiff, do not seem to us to warrant any inference against the bank. Hinckley, although a director of the bank, had an individual interest in the bonds, and the information which led to his negotiations and the recovery of a portion of them, came to him directly because he was the only owner of bonds of that description included in the loss. He was, therefore, allowed by the bank, without objection, to negotiate separately for their return. He recovered $25,000 by the payment of $6000, but $19,000 additional he was unable to obtain, except upon payment of what he deemed to be an exorbitant demand, with which he was unwilling to comply. It is supposed that Hinckley's bonds were a part of the lot amounting in all to $100,000; it is also supposed that this lot included some of the plaintiff's bonds; and it is also supposed that, in consequence of Hinckley's refusal to continue negotiations for the recovery of the remainder of his own bonds, the holders secretly sent them to Europe, where they passed into the hands of innocent holders and became lost beyond recovery; but all this is mere matter of conjecture. There is absolutely in the case no evidence whatever, either that any part of the bonds of the plaintiff constituted a portion of this lot of $100,000, nor that they could have been recovered, either without Hinckley's interference, or if he had pursued his negotiations; nor that the bonds were sent abroad by reason of anything done or omitted by him. Hinckley does, indeed, state, in a letter written by him

to the husband of the plaintiff, that he had reason to suppose that the whole lot of $100,000 might have been purchased for fifty cents on the dollar, but no facts are stated as the ground for this opinion, and there is no proof beyond the conjecture itself. Neither is there any reason to conclude that the bank was responsible either for what Hinckley did or failed to do. There is no evidence to warrant the conclusion that anything the bank could have done, beyond what was done, would have resulted more favorably to the plaintiff.

In our opinion, therefore, the court below was justified in its ruling upon the evidence, instructing the jury to return a verdict for the defendant. The judgment is accordingly

*Affirmed.*