MORRIS v. THIRD NAT. BANK OF SPRINGFIELD, MASS.

(Circuit Court of Appeals, Eighth Circuit. October 23, 1905.)

No. 2,056.

1. TROVER AND CONVERSION—TRIAL—QUESTION FOR JURY—EVIDENCE CONSIDERED.

Evidence considered, in an action for the conversion of certain cattle, and *held* to require the submission to the jury of the question whether a packing house at which the cattle were slaughtered was being operated by a firm of which defendant was a member or by a corporation not a party.

2. BANKS AND BANKING—POWERS OF NATIONAL BANKS—"DISCOUNTING" NOTES.

The power to discount promissory notes and other evidences of debt, expressly given to national banks by Rev. St. § 5136 [U. S. Comp. St. 1901, p. 3455], is sufficiently comprehensive to include the purchase of notes at less than their face value.

3. SAME—INCIDENTAL POWERS IN COLLECTION OF DEBTS.

A national bank, which, in the usual course of its business, has become the owner of notes secured by mortgage, may lawfully agree with others holding conflicting mortgages on the same property to represent all in an action to enforce the security, their respective rights in the proceeds to be subsequently determined, where such action was deemed best for its own interests, and, when vested with title to the other mortgages by proper assignments, its right to maintain the suit cannot be questioned by the defendant on the ground that its agreement was ultra vires.

In Error to the Circuit Court of the United States for the Western District of Missouri.

This was an action by the Third National Bank of Springfield, Mass., against Nelson Morris, Edward Morris, and Frank E. Vogel, partners as Nelson Morris & Co., and the J. C. Bohart Commission Company, a corporation, to recover the value of 226 head of steers alleged to have been converted by them to their own use. Service was obtained only upon the defendant Edward Morris, and the action proceeded against him alone. The right of the plaintiff was averred to be by virtue of three chattel mortgages, one executed by Charles H. Baumbaugh and two by Grant G. Gillett, covering in all 414 head, including those in controversy. The mortgages were duly filed in Dickinson county, Kan., where the cattle were then located. Part of the cattle were branded "J. M.," and the remainder with a device known as "circle dot." It was shown at the trial that Gillett wrongfully, and in fraud of the rights of the then holders of the mortgages, caused 226 head of the mortgaged cattle to be transported from their Kansas location to the stock yards at St. Joseph, Mo., and to be there sold for his own benefit; that in November, 1898, they were purchased by a buyer in the individual service of Nelson Morris, and were then sold to and slaughtered in a packing establishment in St. Joseph which bore the outward sign of Nelson Morris & Co. The plaintiff had judgment, and the defendant sued out this writ of error.

Vinton Pike (Rudolph Wolfner, Henry M. Wolf, and Lucian J. Easton, on the brief), for plaintiff in error.

Henry M. Beardsley and William C. Michaels (Delbert J. Haff, J. W. Parish, Alfred Gregory, and Charles H. Kirshner, on the brief), for defendant in error.

Before SANBORN and HOOK, Circuit Judges, and RINER, District Judge.

HOOK, Circuit Judge, after stating the case as above, delivered the opinion of the court.

Edward Morris did not personally participate in the transactions which are claimed to amount to a conversion of the mortgaged cattle, and if he is liable it must be by reason of the liability of the firm of Nelson Morris & Co., of which he was a member. The 46 assignments of error, so far as they require consideration, present but few general propositions.

1. The request of the defendant at the conclusion of the evidence for a directed verdict was denied. He contends that the evidence conclusively proved that the packing establishment at St. Joseph, Mo., where the cattle were slaughtered, was both owned and operated by the Fairbank Canning Company, an Illinois corporation, and that there was an entire absence of evidence showing that the firm of Nelson Morris & Co. had anything to do either with the purchase of the cattle or their final disposition. It was clearly shown that there was a copartnership styled "Nelson Morris & Co.," and that both Nelson Morris and the defendant were members; that the original purchase of the cattle at the St. Joseph stockyards was for Nelson Morris individually, and not for his firm; that there was an Illinois corporation by the name of Fairbank Canning Company, in which was vested the record title to the packing house and grounds, and that it had close business relations with the firm; that Nelson Morris resold the cattle

either to the firm or to the corporation, whichsoever operated the packing plant, and that the cattle were subsequently slaughtered in that place and their products put in the channels of trade and their identity lost. The jury found that the firm, not the corporation, was conducting the business and was guilty of the conversion of the mortgaged cattle, and the question is whether there was substantial evidence justifying the finding.

In its endeavor to trace the cattle from the stockyards into the packing house the plaintiff took the testimony of several persons connected with the business of Nelson Morris and of his firm. One had been the firm's head bookkeeper at St. Joseph in November, 1898, when the cattle in question were there purchased and slaughtered, and was still in their service. Another was the St. Joseph buyer for Nelson Morris. Another was in charge of the filing office at Chicago of Nelson Morris & Co. and the Fairbank Canning Company. The general ledger of Nelson Morris & Co. showed the purchase on November 16, 1898, of a number of cattle, which doubtless embraced those in question. It also appeared that all of the exterior signs upon the buildings of the packing plant were those of Nelson Morris & Co. Frequent references were made in the testimony of the witnesses to the plant as that of Nelson Morris & Co., and to the business there conducted as the business of that firm. It seemed to be so assumed as a matter of course by those witnesses, and ordinarily they would be presumed to know whereof they were speaking. Considerable of this testimony was in depositions taken before the trial. Defendant's counsel were present, and in some instances cross-examined the witnesses; but at no time was there an endeavor to question the correctness of their assumption that it was Nelson Morris & Co. who operated the plant and conducted the business. The name of the Fairbank Company was occasionally referred to, but not in such a way as to suggest or intimate that it was the active party and that Nelson Morris & Co. was a mere name. With the exception of the testimony of one witness, to which we will hereafter advert, this comprised the evidence upon that feature of the plaintiff's case. At the conclusion of the plaintiff's evidence the defendant produced two witnesses, Bell and Wilson. The former, who was a cashier for Nelson Morris, testified from his records that the cattle sold by his employer in St. Joseph at the time in question were sold to the Fairbank Company, which paid for them, and that the payment was embraced in various checks that were offered in evidence. He did not know whether that company was engaged in the packing business at St. Joseph. Wilson, the general superintendent of the Fairbank Company, testified that it operated the plant at St. Joseph, and no one else was connected with the operation; that Nelson Morris & Co. was a trading concern, a mere trade-name; that the firm was not engaged in the slaughter of cattle; that the signs on the building were put there as an advertisement of the name of Nelson Morris & Co., but that firm had no connection with the packing business.

Now, were this all, there might be some ground for the contention that the testimony of plaintiff's witnesses was inconclusive; that, as

their attention was not directed to the vital question whether it was
the firm or the corporation that conducted the business, their words
were mere inadvertent assumptions, and ought not to prevail over
the positive and direct evidence for the defendant. But there was
another witness whose testimony in behalf of the plaintiff is not
subject to this criticism. The deposition of Charles M. Macfarlane
was taken by the plaintiff and read in evidence. He resided in
Chicago, was the general office manager of Nelson Morris & Co.,
and had been chief accountant in 1898 in Chicago, with the general
supervision of the other officers. He inaugurated the method of
business at St. Joseph when the firm first started in that city. His
testimony, with much detail, is clear and precise that Nelson Morris
& Co. operated the plant at St. Joseph in 1898, and that the firm was
composed of Nelson Morris, Edward Morris, and Frank E. Vogel.
His familiarity with the business was such as to enable him to dis-
tinguish quite clearly between the individual business of Nelson Mor-
ris and that of the firm. He referred to the Fairbank Canning Com-
pany, but not in a way that would indicate that it was conducting
the business at St. Joseph. The reference indicated that he was not
oblivious of the fact that the firm and the corporation were closely
identified. Frequent passages such as these may be found in his
testimony:

"Q. The firm of Nelson Morris & Co. were running a packing house at St.
Joe? A. Yes, sir. Q. That was the business of the firm of Nelson Morris &
Co.? A. Yes, sir. * * * Q. You know of the arrangement, do you? A.
Yes, sir. Q. What was that arrangement? A. Virtually that the cattle would
be bought by Nelson Morris and sold to Nelson Morris & Co."

The witness was cross-examined by defendant's counsel, but there
was not the slightest suggestion, either in question or answer, that
his testimony was erroneous in the particular mentioned. It should
also be said in this connection that the books of Nelson Morris & Co.
showed quite clearly that a check for the cost of the cattle was drawn
by that firm upon its account in the St. Joseph bank. We are of the
opinion, therefore, that there was substantial evidence supporting
the conclusion of the jury as to that feature of the case.

2. It is also contended that a verdict for the defendant should
have been directed, for the reason that none of the mortgages set up
by the plaintiff were valid or sufficient to constitute a lien upon the
cattle therein described. The record shows: In the summer of
1898 Gillett contracted to purchase from one Clark 416 head of
cattle then held in a neighboring county in Kansas. On October
4, 1898, before Gillett had paid for the cattle, before delivery by
Clark and before they had been brought into Dickinson county
where both Gillett and Baumbaugh lived, the former made a bill of
sale of them to the latter which contained an agreement "to de-
liver." On the same day Baumbaugh executed the mortgage on
the cattle to secure his notes, aggregating $24,759.99. These notes
and the mortgage in due course became the property of the plaintiff,
the Springfield bank. On October 9th Clark brought the cattle, then
numbering 414 head, into Dickinson county, where they were de-

livered; but whether that delivery was to Gillett or to Baumbaugh, and whether Baumbaugh ever in fact secured possession of them, are questions over which there is much controversy. Of these cattle 214 were branded "J. M." and 200 were branded "circle dot." On the 13th of October Gillett, who assumed still to own and to be in possession of the cattle, executed a mortgage on those branded "J. M." to secure his note for $7,490, and another mortgage on those branded "circle dot" to secure his note for $7,000. In due course the note and mortgage on the "J. M." cattle became the property of the First National Bank of Omaha, and the note and mortgage on the others became the property of the State Bank of St. Louis. On November 15th Gillett caused 226 head of both brands to be shipped to St. Joseph and sold for his benefit. These are the cattle the value of which is in controversy. A few days later Gillett absconded. The remainder of the 414 head, which had been left in Dickinson county, were subsequently shipped to Kansas City, Mo., where they were sold and the proceeds placed in escrow for the benefit of those lawfully entitled. A suit in interpleader was there instituted in a state court by the custodian of the fund, and the three banks holding the Baumbaugh and Gillett notes and mortgages became parties for the assertion of their rights. The case went to the Supreme Court of Missouri, and it was finally determined that the Baumbaugh mortgage was void, and that the Omaha and St. Louis banks were entitled to the fund arising from the sale of these cattle. 171 Mo. 307, 71 S. W. 191, 60 L. R. A. 256. While the Kansas City cause was pending in the state court the three banks entered into an agreement that the final decision therein should also determine their respective rights, not as to defendant, but as between themselves, to the value of the cattle shipped to St. Joseph. Pursuant to the terms of that agreement the Omaha and St. Louis banks transferred to the Springfield bank the Gillett notes and mortgages, with all rights of action thereon and for the conversion at St. Joseph, and thereupon the action now under review was instituted. In the first count of the plaintiff's petition, upon which the trial was had, its Baumbaugh notes and mortgage were set up; in the second count, the Gillett note and mortgage on the "J. M." cattle, which had been transferred to the plaintiff by the Omaha bank; and in the third count, the Gillett note and mortgage on the "circle dot" cattle, which had been transferred to the plaintiff by the St. Louis bank. The Supreme Court of Missouri held that the bill of sale from Gillett to Baumbaugh conveyed nothing, and the mortgage of the latter was utterly void, for the reason that when those instruments were executed Gillett neither owned nor had possession of the cattle, and Baumbaugh neither then nor afterwards secured possession for himself.

The evidence before that court for review is not the evidence in this case, and the contention is now made that from the present record it appears that Baumbaugh did obtain possession of the cattle, not in time to validate his mortgage previously given, but in time to destroy the validity of those subsequently executed by Gillett; in other words, that the delivery of the cattle by Clark on October 9th

was to Baumbaugh, and that the latter continued in possession until November 15th, when they were wrongfully taken by Gillett and shipped to St. Joseph, and therefore Gillett's two mortgages of the 14th of October were likewise void, because he neither owned nor had possession of the cattle when he made them. These conclusions are made to turn upon the good faith of the transactions between Gillett and Baumbaugh, who was his brother-in-law, and upon the solution of the question, to whom did Clark deliver the cattle, and who thereafter had possession, Gillett or Baumbaugh? The trial court fairly submitted these matters to the jury in connection with a Kansas statute which declares that every sale or conveyance of personal property, unaccompanied by an actual and continued change of possession, shall be deemed to be void, as against purchasers without notice and existing or subsequent creditors, until it is shown that such sale was made in good faith and upon sufficient consideration. It is manifest that the Baumbaugh mortgage of October 4th would be void, and the Gillett mortgages of October 14th would be valid, if it appeared from the evidence that Baumbaugh never secured possession of the cattle from either Clark or Gillett, that Clark delivered to Gillett, that the latter thereafter retained possession, and it was not affirmatively shown that the sale from Gillett to Baumbaugh was in good faith. It should be said in this connection that the three banks were innocent purchasers for value and before maturity of the notes and mortgages held by them, respectively. The verdict of the jury was for the defendant upon the first count of the petition and for the plaintiff upon the other two. Therefore the conclusion of the jury must have been that the Baumbaugh mortgage was void and the Gillett mortgages were valid. There was substantial evidence that from the time of the delivery of the cattle by Clark it was Gillett alone who exercised that dominion and authority over them which pertain to and characterize ownership; that it was he who sent word to Clark to deliver them, who directed that they be put in a certain pasture, who gave all instructions concerning their care, and who furnished the feed for them; that the man who had immediate charge and custody both at the pasture and at the pens recognized Gillett as the owner, and honored without question his order to let part of them go for shipment to St. Joseph. And there is also evidence tending to show that, except for the making of his mortgage whilst the cattle were still with Clark, Baumbaugh was a mere onlooker, while Gillett asserted and exercised authority, control, and ownership. What conclusion we would have reached were we the triors of the facts is beside the question. It is sufficient to say that there was substantial evidence to support the conclusion reached by the jury.

3. Again, it is urged that the motion for a directed verdict should have been sustained for the reason that neither of the national banks secured the ownership of their notes and mortgages, and that the arrangement between the Springfield bank and the other two was ultra vires and void. It is contended that the national banks did not acquire title to their notes and mortgages, because they "purchased" them at their face value less a specified per cent. We presume that

counsel seek to have applied the distinction which is made in some jurisdictions, generally in cases under state usury laws, between a purchase and a discount of commercial paper. But no such distinction can be made here. The discounting of promissory notes and other evidences of debt is within the express granted powers of national banks (Rev. St. § 5136 [U. S. Comp. St. 1901, p. 3455]), and that term is sufficiently comprehensive to include the acquisition both by way of purchase and by way of ordinary loan (Bank v. Johnson, 104 U. S. 271, 26 L. Ed. 742; Fleckner v. Bank, 8 Wheat. 338, 5 L. Ed. 631; Danforth v. Bank, 1 C. C. A. 62, 48 Fed. 271, 17 L. R. A. 622; Bank v. Savery, 82 N. Y. 291; Pape v. Bank, 20 Kan. 440, 27 Am. Rep. 183). In Danforth v. Bank, supra, it was said:

"Upon the score, then, of judicial authority, the conclusion is well warranted that in the business of banking 'discount' in the ordinary acceptance of the term includes what is called 'purchase.' We find nothing in the national banking law to suggest that Congress used the word in any other than its usual commercial sense, or intended to make the distinction between discount and purchase insisted on by the defendant in error."

In Bank v. Savery, supra, it was said that "to buy or purchase a debt is always in commerce termed to discount it." And in Pape v. Bank, supra, Mr. Justice Brewer, then of the Kansas Supreme Court, said in construing a state law:

"And the term 'discounting' includes purchase as well as loan. 'To discount signifies the act of buying a bill of exchange or promissory note for a less sum than that which upon its face is payable.'"

We have previously adverted to the arrangement between the three banks, which was to the effect that the Omaha and St. Louis banks transfer their notes and mortgages and causes of action for conversion to the plaintiff; that the plaintiff institute suit for the recovery of the value of the cattle sold at St. Joseph; and that the rights of the three banks as between themselves be determined by the ultimate result of another suit then pending in a state court at Kansas City to which all of them were parties. Is such an arrangement beyond the power of the plaintiff, a national bank?

It may be conceded that a national bank may not lawfully engage in the business of a trust company or of acting as the representative of others in matters in which it otherwise has no corporate concern, but it does not follow that where its own interests, which have been acquired in the usual course of its business, are involved and have become the subject of controversy or litigation, it is not authorized to combine them with like interests of other persons and to contract to represent the whole. Wylie v. Northampton Bank, 119 U. S. 361, 7 Sup. Ct. 268, 30 L. Ed. 455. A national bank may lawfully do many things in securing and collecting its loans, in the enforcement of its rights and the conservation of its property previously acquired, which it is not authorized to engage in as a primary business. Thus a national bank has no power to subscribe for or deal in the stock of other corporations (First Nat. Bank v. Hawkins, 174 U. S. 364, 19 Sup. Ct. 739, 43 L. Ed. 1007; California Bank v. Kennedy, 167 U. S. 362, 17 Sup. Ct. 831, 42 L. Ed. 198); but in the usual course of its

business it may accept such stock as collateral to a loan, and thereafter, through the enforcement of the loan, become the owner of the stock (National Bank v. Case, 99 U. S. 628, 25 L. Ed. 448); or it may accept such stock in compromise and satisfaction of its claims (First National Bank v. National Exchange Bank, 92 U. S. 122, 23 L. Ed. 679). It has been held by this court that, under the power to purchase and hold such real estate "as shall be necessary for its immediate accommodation in the transaction of its business" (Rev. St. § 5137 [U. S. Comp. St. 1901, p. 3460]), a national bank having a lease of a plot of ground for 99 years may erect thereon a building of a size largely in excess of its own immediate requirements for the purpose of renting apartments to others (Brown v. Schleier, 118 Fed. 981, 55 C. C. A. 475). It was said:

"Nor do we perceive any reason why a national bank, when it purchases or leases property for the erection of a banking house, should be compelled to use it exclusively for banking purposes. If the land which it purchases or leases for the accommodation of its business is very valuable, it should be accorded the same rights that belong to other landowners of improving it in a way that will yield the largest income, lessen its own rent, and render that part of its funds which are invested in realty most productive. There is nothing, we think, in the national bank act, when rightly construed, which precludes national banks, so long as they act in good faith, from pursuing the policy above outlined."

In Cockrill v. Abeles, 86 Fed. 505, 30 C. C. A. 223, it was held that, where a national bank acquired an undivided interest in real property in satisfaction of a debt, it might thereafter lawfully purchase other undivided interests in the property and discharge existing liens and incumbrances, if such course was necessary to enable it to manage or dispose of the property to better advantage. In Cooper v. Hill, 94 Fed. 582, 36 C. C. A. 402, a national bank owned an abandoned mining property. "The shaft and drifts were filled with water, the machinery silent, and the tools gone." It was held that under its incidental and implied powers the bank had authority to expend money in putting the property in presentable condition to attract purchasers. Such cases are sufficient to illustrate the latitude that is permitted national banks, not in the character of the acts they may primarily engage in as a business, but in the management and protection of property and property rights acquired in the usual course of banking transactions, and it includes such minor incidental powers as may be reasonably adapted to the ends in view. As was said by the Supreme Court in Wylie v. Northampton Bank, supra:

"It would certainly be competent for a national bank to take measures for the recovery of its own property lost in the way described. If the loss, as in the present case, included the property of others, and it was deemed best, having reference to the bank's own interest, that these measures should be taken by the bank alone for itself and all concerned, it might lawfully undertake to act for others thus jointly concerned with itself, as well as for itself alone; and want of proper diligence, skill, and care in the performance of such an undertaking would be ground for liability to respond in damages for such failure."

In First National Bank v. National Exchange Bank, 92 U. S. 122, 23 L. Ed. 679, the court said, in speaking of the incidental powers

of a national banking association and the necessity of collecting or securing its debts and meeting its obligations:

"Compromises to avoid or reduce losses are oftentimes necessary results of this condition of things. These compromises come within the general scope of the powers committed to the board of directors and the officers and agents of the bank, and are submitted to their judgment and discretion except to the extent that they are restrained by their charter or by-laws. Banks may do in this behalf whatever natural persons could do under like circumstances."

It should be observed in this connection that when the arrangement between the banks was entered into, and when this action was commenced, the suit in the state court had not been determined, and it was not known that the Baumbaugh note and mortgage were not valid, or that the plaintiff would not be the sole beneficiary of its proceeding. It therefore properly sought to escape expensive and vexatious complications arising from the assertion of conflicting claims to the cause of action, and the course adopted was also distinctly to the advantage of the defendant, in that he avoided a multiplicity of actions and the possibility of a double recovery. Therefore, even assuming that the defendant is in a position to urge the doctrine ultra vires, we are of the opinion that the Baumbaugh note and mortgage were lawfully acquired by the plaintiff; that the arrangement with the other banks was well within its implied and incidental powers; and that it thereby secured, in any view, a perfect title to the cause of action against the defendant. It is clear that the cause of action was assignable. Conn. Mut. Life Ins. Co. v. Smith, 117 Mo. 261, 289, 22 S. W. 623, 38 Am. St. Rep. 656.

We have considered this case as though the opinion, mandate, and decree of the state courts in the suit concerning the proceeds of the remainder of the mortgaged cattle had been received in evidence. The conclusions already expressed indicate that, even if such records were admissible, their exclusion by the trial court did not prejudice the defendant. The many other matters, presented and ably argued by counsel, have received our attention; but we have found in them nothing sufficient to disturb the judgment of the trial court.

The judgment is affirmed.