## SECOND NAT. BANK OF PARKERSBURG, W. VA., et al. v. UNITED STATES FIDELITY & GUARANTY CO.*

(Circuit Court of Appeals, Fourth Circuit.   April 30, 1920.)

### No. 1781.

1. **Banks and banking ⬤➝260(4)—Incidental powers of national banks authorize contract of indemnity.**

   National banks, which were unsecured creditors of a bankrupt corporation, having practically no assets except an uncompleted government contract, *held*, under Rev. St. § 5136 (Comp. St. § 9661[7]), giving such banks "all such incidental powers as shall be necessary to carry on the business of banking," to have power to join in execution of a bond to indemnify a surety company against loss by reason of its suretyship for bankrupt on its contract, to enable the trustees in bankruptcy to proceed with and complete the contract work.

2. **Indemnity ⬤➝4—Agreement to forego rights valid consideration for indemnity bond.**

   Where a surety company, as surety for a bankrupt government contractor, had the right to take over the contract, with plant and materials, and to receive all sums then due under the contract, an indemnity bond given by creditors to induce it to forego such rights *held* based on a valuable consideration.

3. **Indemnity ⬤➝9(2)—Costs and expenses within scope of contract.**

   A bond, indemnifying a surety from all loss and liability "heretofore accrued or hereafter accruing against it by reason of its suretyship" on the contract, *held* broad enough to cover cost and expense incurred in

litigating fraudulent claims asserted, against which the indemnitors, although notified, refused to contest.

Appeal from the District Court of the United States for the Northern District of West Virginia, at Parkersburg; Alston G. Dayton, Judge.

Suit by the United States Fidelity & Guaranty Company against the Second National Bank of Parkersburg, W. Va., and another. Decree for complainant, and defendants appeal. Affirmed.

. V. B. Archer, of Parkersburg, W. Va. (W. H. Wolfe, of Parkersburg, W. Va., on the brief), for appellants.

B. M. Ambler, of Parkersburg, W. Va. (Van Winkle & Ambler, of Parkersburg, W. Va., on the brief), for appellee.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

PRITCHARD, Circuit Judge. This is another of the numerous cases growing out of the bankruptcy 16 years ago of the Evansville Contract Company. That concern had, prior to its adjudication, contracted with the United States to build certain locks and dams in the Ohio, the Big Sandy, and the Congaree rivers. The United States Fidelity & Guaranty Company, herein called the surety, was on its bond in the aggregate amount of $200,000. To induce the surety to execute these bonds the bankrupt agreed that, if it became unable to complete or carry on the contract, it would, and did, assign the plant it owned or had upon the work to the surety, and, in the event of any breach or default of the contract with the United States, the surety should be subrogated to all its rights and properties, as principal, in such contract, and that all deferred payments and all the moneys due and payable to it at the time of the breach, or which might thereafter become due, should be credited upon any claims against the surety upon the bond.

At the time of the adjudication, the government was retaining $11,000 earned by the bankrupt, and the latter had $20,000 or more of material on hand on the work. It owed about $40,000 for claims for labor and materials, for which the surety was secondarily liable. It apparently had little or no other assets, and its unsecured debts footed up $200,000, of which an aggregate of $115,000 was due to the appellants and five other national banks; the appellants themselves being creditors in the amounts of $25,000 and $20,000, respectively.

It was clear enough that, if the general creditors could not get something out of the contracts, they stood to lose practically all their claims. As is usual in such cases, the officers and employés of the bankrupt concern were absolutely sure that a large profit would be realized if the work was only carried on to completion, and, as so often happens, the creditors, who were otherwise hopeless of getting anything, were persuaded that they could save something if the work was finished. To enable the trustees to complete the contracts the creditors were willing to advance money up to the amount of $75,000, but before anything could be done in this direction it was necessary to come to terms with the surety, which had the right to take over the contracts and complete them itself. The surety believed that if it went on with the contracts it would get out whole. It did not know what would happen

if it put the performance of them in the hands of the trustees in bankruptcy. So, in substance, it took the position that the creditors could take their choice: They could let it carry out the contract, or it would turn the whole matter over to the trustees; but in the latter event it must be absolutely protected against all liability it had incurred or might thereafter incur. The seven national banks, each through the action of its board of directors, elected the second alternative, and as a result, on the 4th of April, 1904, gave a bond in the aggregate amount of $75,000, each of the obligors, however, becoming bound for only the same proportion of any sum that might become payable under the bond as its claim against the bankrupt was of the aggregate claims of it and its six associates. This bond, after reciting a number of the facts, stated that the obligors believed it to the interest of the creditors that the contracts be finished by the bankruptcy trustees, and that money be borrowed by the trustees under the orders of the bankruptcy court, and that the surety was unwilling that this course be taken unless it was indemnified against any liability that had accrued, or might accrue, to it by reason of its suretyship. The condition of the obligation was that the obligors should in all respects indemnify and save harmless the surety from all loss, charge, damage, and liability theretofore accrued, or thereafter accruing, against it by reason of its suretyship, or liability, on the bonds.

Thereupon, under orders of the bankruptcy court, the trustees went on with the work. As in at least nine out of ten such cases, the high expectations with which they entered upon the task were disappointed. Many of the claims due at the time of the bankruptcy, and for which the surety was liable, were subsequently bought at a great discount by persons formerly connected with the bankrupt. The surety resisted the claims of the purchasers to be paid in full, and as a result of long and expensive litigation their demands were materially cut down. It is not now disputed that the amount actually paid by the surety for such claims was $18,600. In the suits in which the surety company defended itself against the claims as first presented, and the other litigation resulting from the suretyship, much expense was incurred for counsel fees and other incidental expenses, such as for copies, documents, printing, premiums on appeal bonds, etc. Some of these items were disallowed by the court below, but those for which it held the obligors on the bond liable amounted to $20,451. The appellants deny all liability on the bond given to the surety, asserting that as national banks they had no power to enter into such an obligation, and that, even if they had, it was not binding on them, because it was, to the knowledge of all the parties, assumed for the purpose of facilitating the carrying out of the order of the bankruptcy court directing the trustees to complete the contract, and to borrow, if need be, as much as $75,000 for such purpose.

[1] It is insisted by appellants that—

"The execution of the indemnity bond and the entry of the parties into the agreement or scheme for borrowing money, issuing certificates of indebtedness, and all obligations of the banks as enumerated in the indemnity bond, were against public policy; and, as the banks had no power or authority to execute the guaranty bond, it is illegal, because ultra vires."

As we have stated, these two banks holding debts against the contract company, to wit, Second National Bank of Parkersburg, $25,-000, and the Farmers' & Mechanics' National Bank, $20,000, on February 13, 1904, joined in a petition to have the contract company adjudicated a bankrupt, and procured that adjudication on February 27, 1904. It was upon their petition a receiver was appointed under section 3e of the Bankruptcy Law (Comp. St. § 9587), which required them to give an indemnifying bond. It was made to appear by the report of the trustees that a large profit, as we have stated, could be made by finishing the government dam contracts, and that the interest of creditors demanded that the business of the bankrupt be continued, and that these profits in question be realized. This course was authorized by Bankruptcy Act, § 2, cl. 5 (section 9586), and under section 55c (section 9639) it is provided that—

"The creditors shall at each meeting take such steps as may be pertinent and necessary for the promotion of the best interests of the estate."

It was then generally understood that the plan proposed was the only hope of the general creditors. At that time it was but natural that the banks, who were pecuniarily interested in the outcome, should accept the proposition which, as we have said, gave promise of fruitful results. Thus it was that the necessary steps were taken culminating in the indemnity agreement upon which this decree is based. While the indemnity bond in question was not executed under the provisions of the Bankruptcy Act, nevertheless, in view of their status as creditors, these banks had the sanction of the Bankruptcy Law for executing an indemnity bond to protect their interest in the bankruptcy estate.

The question as to the wisdom of the directors in entering into an agreement of this kind is not involved; the real question being as to whether the banks at that stage of the proceedings had the power to enter into an agreement of this kind for the purpose of self-protection in the collection of their debts. In other words, were they not warranted in taking such steps as were necessary to conserve the assets of the banks, and could their acts in this respect be said to be ultra vires?

Section 5136, Rev. St., in the National Banking Act (Comp. St. § 9661), among other things, provides:

"Third. To make contracts. * * *

"Seventh. To exercise by its board of directors, or duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes according to the provisions of this title."

The limitations contained in the foregoing section were intended to insure the safe management of the affairs of a national bank, so as to protect the owners thereof in the safe conduct of its affairs, and as a guaranty that the management of such bank should at all times be free from speculation, the assumption of undue risks, or the doing of anything else calculated to injure the public by impairing the credit of the

bank. It also confers upon the directors "all such incidental powers as shall be necessary to carry on the business of banking." In referring to this phase of the question, the Supreme Court of the United States, in the case of First Nat. Bank v. Nat. Exchange Bank, 92 U. S. 122, 23 L. Ed. 679, affirming 39 Md. 600, said:

"* * * Authority is thus given to transact such a banking business as is specified, and all incidental powers necessary to carry it on are granted. These powers are such as are required to meet all the legitimate demands of the authorized business, and to enable a bank to conduct its affairs, within the general scope of its charter. * * * This necessarily implies the right of a bank to incur liabilities in the * * * course of its business, as well as to become a creditor of others. * * * Obligations may be assumed that result unfortunately. * * * Compromises to avoid or reduce losses are oftentimes the necessary results. * * * These compromises come within the general scope of the powers committed to the * * * directors and officers, * * * and are submitted to their judgment and discretion, except to the extent that they are restrained by the charter. * * * Banks may do, in this behalf, whatever natural persons could do under like circumstances."

This rule is also announced in Bank v. Vermont, 231 U. S. 120, 140, 34 Sup. Ct. 31, 58 L. Ed. 147.

It is highly important that the directors of a bank should be vested with the power for the protection of assets and the saving of debts. In 7 Corpus Juris, p. 831, it is stated:

"The power to adopt reasonable and necessary methods for the collection and the security of debts is necessarily incident to the powers expressly granted to national banks. * * *"

In Morris v. Third Nat. Bank of Springfield, Mass., 142 Fed. 25, 73 C. C. A. 211, the Circuit Court of Appeals for the Eighth Circuit, said:

"It may be conceded that a national bank may not lawfully engage in the business of a trust company or of acting as the representative of others in matters in which it otherwise has no corporate concern, but it does not follow that where its own interests, which have been acquired in the usual course of its business, are involved and have become the subject of controversy or litigation, it is not authorized to combine them with like interests of other persons and to contract to represent the whole. Wylie v. Northampton Bank, 119 U. S. 361, 7 Sup. Ct. 268, 30 L. Ed. 455. A national bank may lawfully do many things in securing and collecting its loans, in the enforcement of its rights and the conservation of its property previously acquired, which it is not authorized to engage in as a primary business. Thus a national bank has no power to subscribe for or deal in the stock of other corporations (First Nat. Bank v. Hawkins, 174 U. S. 364, 19 Sup. Ct. 739, 43 L. Ed. 1007; California Bank v. Kennedy, 167 U. S. 362, 17 Sup. Ct. 831, 42 L. Ed. 198) ; but in the usual course of its business it may accept such stock as collateral to a loan, and thereafter, through the enforcement of the loan, become the owner of the stock (National Bank v. Case, 99 U. S. 628, 25 L. Ed. 448) ; or it may accept such stock in compromise and satisfaction of its claims (First National Bank v. National Exchange Bank, 92 U. S. 122, 23 L. Ed. 679). It has been held by this court that, under the power to purchase and hold such real estate 'as shall be necessary for its immediate accommodation in the transaction of its business' (Rev. St. § 5137 [U. S. Comp. St. 1901, p. 3460]), a national bank having a lease of a plot of ground for 99 years may erect thereon a building of a size largely in excess of its own immediate requirements for the purpose of renting apartments to others (Brown v. Schleier, 118 Fed. 981, 55 C. C. A. 475). It was said: 'Nor do we perceive any reason why a national bank, when it purchases or leases property for the erection of a banking house, should be compelled to use it exclusively

for banking purposes. If the land which it purchases or leases for the accommodation of its business is very valuable, it should be accorded the same rights that belong to other landowners of improving it in a way that will yield the largest income, lessen its own rent, and render that part of its funds which are invested in realty most productive. There is nothing, we think, in the national bank act, when rightly construed, which precludes national banks, so long as they act in good faith, from pursuing the policy above outlined.'

In Cockrill v. Abeles, 86 Fed. 505, 30 C. C. A. 223, it was held that, where a national bank acquired an undivided interest in real property in satisfaction of a debt, it might thereafter lawfully purchase other undivided interests in the property and discharge existing liens and incumbrances, if such course was necessary to enable it to manage or dispose of the property to better advantage. In Cooper v. Hill, 94 Fed. 582, 36 C. C. A. 402, a national bank owned an abandoned mining property. 'The shaft and drifts were filled with water, the machinery silent, and the tools gone.' It was held that under its incidental and implied powers the bank had authority to expend money in putting property in presentable condition to attract purchasers. Such cases are sufficient to illustrate the latitude that is permitted national banks, not in the character of the acts they may primarily engage in as a business, but in the management and protection of property and property rights acquired in the usual course of banking transactions, and it includes such minor incidental powers as may be reasonably adapted to the ends in view. As was said by the Supreme Court in Wylie v. Northampton Bank, supra: 'It would certainly be competent for a national bank to take measures for the recovery of its own property lost in the way described. If the loss, as in the present case, included the property of others, and it was deemed best, having reference to the bank's own interest, that these measures should be taken by the bank alone for itself and all concerned, it might lawfully undertake to act for others thus jointly concerned with itself, as well as for itself alone; and want of proper diligence, skill, and care in the performance of such an undertaking would be ground for liability to respond in damages for such failure.' "

It is urged by appellants that the indemnity bond is void upon the ground that this court, in the case of Bray v. Johnson, 166 Fed. 57, 91 C. C. A. 643, ruled that Johnson, the referee, should not have made the order of April 4, 1904, contending that this indemnity bond was related to that order. This position is untenable, inasmuch as such order has never been attacked and could not be assailed by the appellants, who themselves were parties to and voted for it. The referee was vindicated by the court, which, among other things, held that he was "not guilty of the slightest impropriety."

Under the order of April 11, 1904, it appears that the trustees borrowed money to be used as a fund connected therewith in making renewals and expenditures, handling and accounting for over $415,000; the proceeds of plant and property was $65,000, making all told a grand total of $480,000, but winding up with only $30,000 net. In the court below, presided over by the late Judge Jackson, Johnson, as referee, was allowed fees of 1 per cent. on all the moneys paid out, upon which $1,500 was paid him. After the retirement of Judge Jackson, his successor held that the court was precluded by the former order, and that the referee should be allowed 1 per cent. on $430,657, less $1,500 already received, and gave judgment for $2,806.50, and from this decree the trustee appealed to this court. The court held that under the statute not exceeding 1 per cent. could be allowed on sums paid in dividends, and that inasmuch as only $30,000 could be so paid, his commission

under the law should be $300. However, the court reached the conclusion that, inasmuch as no appeal was taken from the order of Judge Jackson, which had been acted upon by the parties in good faith, it therefore should not be set aside, and that the $1,500 paid should stand, and that the allowance of $2,806.50 could not be sustained. It should be remembered that the order of Judge Jackson was not held to be void, although it was erroneous, and therefore the only question in the judgment was in regard to commissions; the judgment being founded upon the words of the statute.

It is insisted by appellee that appellants rely upon an obiter in argument, to the effect that a referee should not be allowed to increase his emoluments by continuing a business, and borrowing money, and taking a commission on all the money handled. In the case of Bray v. Johnson, supra, the court said:

"The courts are authorized to continue the business of bankrupts, and this referee exercised this authority, which, in passing, it may be said as to a transaction of this magnitude, without the express sanction of the court, was of exceedingly doubtful propriety, and the issuance of trustees' certificates for $75,000, or indeed for any amount, assuming it should be done in a bankruptcy case at all, ought manifestly not to be thought of by a referee. The temptation, if a referee could thus increase his compensation, to err, would be too great."

It should be remembered, however, that the court permitted the allowance of $1,500 in favor of the referee, five times as much as the court deemed lawful, to stand, and now appellants seek to avoid their contract under the decision in that case. It appears, however, that the Fidelity Company never handled any money realized from the sale of the certificates. It is clear that, if the trustees had borrowed on their own credit without certificates, the law would have reimbursed them. That transaction is completely wiped out, and cannot avail appellants in this controversy. What the court said as respects this phase of the question is purely obiter and not binding. There is not the slightest suggestion contained in the record that the Fidelity Company was guilty of any fraud. The bond now in question was made in good faith and accepted by all the parties who were obviously promoting their own interests.

[2] It is urged that there was no consideration upon which to base this transaction. When we take into consideration the benefits received by the banks, or consider the risks and prejudice to the Fidelity Company, we think the consideration was ample. Further, the recitals of the contract import a consideration and the appellants are estopped from denying the same. As we have stated, the Fidelity Company had a lien and a right of possession, and control of material and plant, and all money in the hands of the United States, being vested with the right to take hold of unfinished jobs and complete them. The banks naturally reached the conclusion that there was a profit in continuing the business through the trustees, hence their anxiety to bring about such an arrangement, and they readily agreed, in order to promote "the interests of the undersigned creditors," to indemnify the surety, if they could only have an opportunity to participate in any benefits growing out of the finishing of the contracts. It was faith

in this indemnity that induced the Fidelity Company to waive its rights.

[3] However, it is urged by appellants that this bond does not cover material claims, charges for professional services, copies of records, printing, costs, etc. This objection is urged upon two grounds by which they claim they are exempt: (a) That they are not within the terms of the indemnity; (b) that the material claims in question had accrued against the Fidelity Company before the indemnity contract was executed. It is made perfectly plain by the indemnity contract that the Fidelity Company was unwilling to agree to the proposed contract or indemnity, unless it should be indemnified against any liability that had accrued, or might accrue by virtue of its suretyship on the bonds above mentioned. Therefore, among other things, it recited:

"Now, therefore, if the above bound obligors shall and will, in all respects, indemnify and save harmless the Fidelity Company from all loss, charge, damage, and liability heretofore accrued or hereafter accruing against it, by reason of its suretyship or liability on said bonds, and on each of them, then this obligation to be void."

The foregoing makes it very clear that it was the purpose of the banks to save the Fidelity Company harmless, and this contention on the part of the Fidelity Company is reinforced by the following explanation at the end of the order in which the trustees are directed and authorized "to fully and completely release and save harmless any and all sureties which may have guaranteed the completion of said contracts." The use of the word "all" fairly indicates that the language of the contract was not to be modified in any respect as to matters growing out of this transaction.

It appears from the decree that suits and proceedings were taken against the surety company for claims based on the four bonds. It further appears that proceedings were necessary to enforce the liens upon funds in bankruptcy, and that appellants were notified of the existence of such suits and proceedings, but refused to take any steps. In the emergency thus created the company employed counsel learned in the law, and the appellee and counsel acted in good faith. We think that under the guarantee of the banks, as well as in equity and good conscience, the banks should be required to save the appellee harmless as respects the costs of these services.

Mr. Ambler, who was a witness, testified at length in regard to the services and charges, the measure of labor, and the reasons and correctness. He also testified as to the propriety and good faith of the litigation, explained the vouchers, and gave references supporting his statements. Mr. Schoyer testified as to the history of matters in the District Court and the Court of Appeals in Pennsylvania. The testimony of these witnesses is not denied or contradicted in the slightest, and, as we have stated, the Fidelity Company notified the appellants of the proceedings, and it impleaded them in the West Virginia proceedings, and called on the appellants to defend, warning them at the time, if they made default in the performance of their duty under their contract, that it would hold them liable for all costs, charges, and expenses.

It appears, among other things, that Bray, trustee, and Eichel, had bought up claims at a discount, including some of the lien claims in question, and that for a number of years they sought to have the funds in bankruptcy applied to common creditors—held by them. It further appears that these parties instituted suit in Pennsylvania to compel the surety to pay par for claims partly fraudulent, and partly discounted. It also appears that they put the claims in the name of Mrs. Eichel, and sought to have the surety pay off the liabilities in Pittsburgh, while the claims themselves were assigned to third parties in order that others might in this manner receive the money on the dividends in bankruptcy, and leave the Fidelity Company to pay the claims and lose the security. Thus it will be seen that it required great diligence on the part of counsel to ferret out these fraudulent claims so as to protect the creditors. This litigation we think was highly beneficial and successful, and inured to the benefit of the indemnitors.

It is further insisted by counsel for appellee that—

"The trustees, of their election, used resources of the estate, and piled up expenses of over $20,000, none of which would have been expended, if the Fidelity Company had taken matters in its own hands, and had not accepted the bond and deed of the banks."

In conclusion we feel that by the rule of honesty and fair dealing, these banks should be required to save the appellee harmless as respects these matters.

For the reasons stated, we think that the decree of the lower court is proper, and should be affirmed.