FIRST NATIONAL BANK OF CHARLOTTE *v.* NATIONAL EX-
CHANGE BANK OF BALTIMORE.

1. In adjusting and compromising contested claims against it growing out of a
legitimate banking transaction, a national bank may pay a larger sum than
would have been exacted in satisfaction of them, so as to thereby obtain a
transfer of stocks of railroad and other corporations, in the honest belief,
that, by turning them into money under more favorable circumstances than
then existed, a loss, which it would otherwise suffer from the transaction,
might be averted or diminished.  So, also, it may accept stocks in satisfac-
tion of a doubtful debt, with a view to their subsequent sale or conversion
into money in order to make good or reduce an anticipated loss.
2. Such transactions would not amount to dealing in stocks, and they come within
the general scope of the powers committed to the board of directors and
the officers and agents of a national bank.  Subject to such restraints as
its charter and by-laws impose, they may do in this behalf whatever natural
persons can lawfully do.
3. Dealing in stocks by a national bank is not expressly prohibited; but such a
prohibition is implied from the failure to grant the power.

ERROR to the Court of Appeals of the State of Maryland.

The plaintiff, a national bank organized under the laws of
the United States, and doing business at Charlotte, N.C., de-
siring to increase its capital stock, and for that purpose to
deposit with the treasurer of the United States at Washington
$50,000 in bonds of the United States, employed Bayne & Co.,
of Baltimore, as its agent, to procure and deliver them at the
treasury.   Not having money to pay for them at the time, the
plaintiff sent its president, Wilkes, to Baltimore, with a certifi-
cate previously prepared in Charlotte, as follows: —

> "FIRST NATIONAL BANK OF CHARLOTTE, N.C.,
> "CHARLOTTE, Dec. 15, 1865.

"Received on deposit, from Bayne & Co., fifty-five thousand
United States 5-20 bonds, third issue, payable to the order of them-
selves on return of this certificate.

> "JOHN WILKES,
> *"Pres. First Nat. Bk., Charlotte, N.C."*

This certificate was delivered by Wilkes to Bayne & Co. in
Baltimore; and on the 18th of December, 1865, they, having
indorsed the same, deposited it, together with other securities,

with the National Exchange Bank of Baltimore, as collateral security for a call loan of $80,000 then made by that bank to said firm of Bayne & Co.

A few days after the delivery of said certificate, the plaintiff deposited in New York, to the credit of Bayne & Co., a sum sufficient to pay the same, and received, in January, 1866, oral notice from them that the certificate was discharged, and subject to its order. In March, 1866, the plaintiff received a written notice to the same effect, but did not apply for the surrender of said certificate. In April following, Bayne & Co. failed; and the plaintiff was then notified by the defendant that it held the certificate of deposit for value, and demanded the delivery of the bonds therein mentioned.

Wilkes, the president, was sent by the plaintiff to Baltimore to negotiate for the return of said certificate. He informed the defendant that it had been satisfied by the payment to Bayne & Co., and disavowed any legal liability on account of same to the defendant. To avoid suit, however, Wilkes offered to pay $5,000 upon the delivery of the certificate; which defendant refused, but offered to take $20,000, and threatened suit unless so settled. Wilkes declined to pay this sum, but asked for delay until he could return to Charlotte and consult the directors of his bank. He again returned to Baltimore, and new negotiations for compromise of the controversy between the two banks in regard to their respective rights to the certificate were opened. Wilkes ascertained that the defendant held, among its collaterals from Bayne & Co., a large number of shares of Washington, Alexandria, and Georgetown Railroad stocks, the market-value of which had been seriously depressed by the failure of Bayne & Co. Having informed himself in regard to the condition of the stock and its supposed value, and after one or two interviews with the president and directors of the defendant, it was finally agreed that the plaintiff should take four hundred shares of the Washington, Alexandria, and Georgetown Railroad stock, and one thousand shares of the Maryland Anthracite stock, the same being valued at $40,000; and one hundred and twenty-five shares of the stock of the plaintiff, valued at $15,000, — the latter, inasmuch as he was advised that a national bank could not buy its own stock, to be taken by

Wilkes himself; thus making $55,000. Upon the basis of this settlement, the defendant was to deliver to Wilkes the certificate held by it for the $55,000 United States bonds. The plaintiff paid to the defendant the sum of $40,000 according to the terms of the above settlement, and received the certificates for one thousand shares coal stock. The four hundred shares of railroad stock were not then delivered, there being a suit about it at the time of the agreement which prevented all transfers; but it was regarded and treated by both parties as belonging to the plaintiff.

In September, 1869, nearly three years after the date of the settlement, suit was brought by the plaintiff in the Superior Court of Baltimore City to recover the $40,000 paid by it to the defendant in pursuance of the arrangement above stated. At the request of the plaintiff, the court granted the following propositions of law: —

*First*, That if the plaintiff agreed to purchase for $40,000 the railroad and coal stock, and paid that sum, then the court must find for the plaintiff for that amount; provided the court shall find that the defendant knew the plaintiff to be a national bank, and shall further find that the certificate of deposit was delivered up in consequence of said contract, if by said contract no part of the $40,000 was to be paid for the certificate.

*Second*, That if the plaintiff agreed to purchase the said stock for $40,000, and Wilkes also agreed to purchase for $15,000 one hundred and twenty-five shares of plaintiff's stock, and the inducement to both agreements was Wilkes's desire to obtain the certificate of deposit, and he did so obtain it, that does not inure to make the first contract valid, provided the court shall find, that, by the first-mentioned contract, the consideration for which the sum of $40,000 was to be paid was the railroad and coal stock, and that no part of said sum was to be paid for the certificate of deposit.

*Third*, That if the plaintiff, in order to compromise the certificate of deposit, agreed to purchase it and the railroad and coal stock for 40,000, and paid the money, then the plaintiff is entitled to recover so much of said sum as the court shall find was paid for said stock.

The court found for the defendant, and rendered a judgment in its favor, which the Court of Appeals affirmed: whereupon the case was brought here by writ of error.

*Mr. J. Upshur Dennis* and *Mr. John Scott, Jr.*, for the plaintiff in error.

The determination of the validity of the transaction involved in this case must necessarily depend upon the construction of the National Banking Law.

The eighth section of that law enumerates the powers which a national bank can exercise. Every other power is as much withheld as if it was in express terms prohibited. *Pearce* v. *Mad. & Ind. R.R.*, 21 How. 442; *Bank of Augusta* v. *Earle*, 13 Pet. 587; *Perrine* v. *Ches. & Del. Canal Co.*, 9 How. 184; *Penn., Del., & Md. Steam Nav. Co.*, 8 G. & J. 319.

No clause gives it power to purchase stocks: on the contrary, the authority specifically conferred on it to buy exchange, coin, and bullion, raises the conclusive presumption that the omission of that power was intentional. *Expressio unius exclusio alterius.*

Conceding that the two agreements — the one for the abandonment of the claim, and the other for the purchase of stock — may be inseparably united, it is insisted that the court below erred in holding that a power to *acquire* stocks is incidental to that of providing for the discharge of a disputed claim by way of compromise. Taking any thing from the defendant but a release or a discharge, transcends the limits of necessary powers, and enables a corporation to accomplish indirectly that which was intended to be prohibited. Upon the principle which underlies the opinion of the Court of Appeals, it may be said that a corporation has, as an incident to the power to discharge its indebtedness, that of acquiring the requisite funds; and, as a legitimate means of so doing, the privilege of engaging in business of any kind, provided its real and *bona fide* object is to meet outstanding demands against it. This line of argument would give these creatures of the statute every power, the exercise of which is not in positive terms forbidden.

The true doctrine is, that an implied or incidental power must be deducible from the grant, and fairly within its scope; partake of the same character as the specifically granted powers,

but not enlarge them; and tend *naturally* to secure the same result. A power to discharge may embrace that of making a payment of any kind whatever, but not that of purchasing or acquiring. That is a distinct and substantive power of an entirely different nature. *Pearce* v. *Mad. & Ind. R.R.*, *supra; East Anglican Rys.* v. *Eastern Counties Ry.*, 7 Eng. Law & Eq. 508; *Hood* v. *N. Y. & N. H. R.R.*, 22 Conn. 1 id. 502; *Russell* v. *Topping*, 5 McLean, 197; *Clark* v. *Farrington*, 11 Wis. 323; *Beatty* v. *Knowles*, 4 Pet. 167.

The precise proposition involved in this controversy has been decided in *Talmage* v. *Pell*, 3 Seld. 328. See also *Fowler* v. *Scully*, 72 Penn. 461; *Shoemaker* v. *National Mechanics' Bank*, 2 Abb. C. C. 422; *Shinkle* v. *First National Bank of Ripley*, 22 Ohio, 516; *Wiley* v. *First National Bank of Brattleboro'*, 47 Vt. 552; *First National Bank of Lyons* v. *Ocean National Bank*, N. Y. Ct. of Ap., Albany Law Jour., April 17, 1875.

The Court of Appeals of Maryland, in *Weckler* v. *First National Bank of Hagerston*, decided at the April Term, 1875, but not yet reported, has changed its former views, and recognizes and enforces the doctrine announced in *Talmage* v. *Peel*, *supra*.

*Mr. William F. Frick, contra.*

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

The question presented for our consideration in this case is, whether a national bank, organized under the National Banking Act, may, in a fair and *bona fide* compromise of a contested claim against it growing out of a legitimate banking transaction, pay a larger sum than would have been exacted in satisfaction of the demand, so as to obtain by the arrangement a transfer of certain stocks in railroad and other corporations; it being honestly believed at the time, that, by turning the stocks into money under more favorable circumstances than then existed, a loss, which would otherwise accrue from the transaction, might be averted or diminished. Such, according to the finding below, was the state of facts out of which this suit has arisen. That finding is conclusive upon us.

A national bank can "exercise by its board of directors, or

duly authorized officers or agents, subject to law, all such incidental powers as shall be necessary to carry on the business of banking, by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt; by receiving deposits; by buying and selling exchange, coin, and bullion; by loaning money on personal security; and by obtaining, issuing, and circulating notes." Rev. Stat., sect. 5136, par. 7; 15 Stat. 101, sect. 8.

Authority is thus given to transact such a banking business as is specified, and all incidental powers necessary to carry it on are granted. These powers are such as are required to meet all the legitimate demands of the authorized business, and to enable a bank to conduct its affairs, within the general scope of its charter, safely and prudently. This necessarily implies the right of a bank to incur liabilities in the regular course of its business, as well as to become the creditor of others. Its own obligations must be met, and debts due to it collected or secured. The power to adopt reasonable and appropriate measures for these purposes is an incident to the power to incur the liability or become the creditor. Obligations may be assumed that result unfortunately. Loans or discounts may be made that cannot be met at maturity. Compromises to avoid or reduce losses are oftentimes the necessary results of this condition of things. These compromises come within the general scope of the powers committed to the board of directors and the officers and agents of the bank, and are submitted to their judgment and discretion, except to the extent that they are restrained by the charter or by-laws. Banks may do, in this behalf, whatever natural persons could do under like circumstances.

To some extent, it has been thought expedient in the National Banking Act to limit this power. Thus, as to real estate, it is provided (Rev. Stat., sect. 5137; 13 Stat. 107, sect. 28) that it may be accepted in good faith as security for, or in payment of, debts previously contracted; but, if accepted in payment, it must not be retained more than five years. So, while a bank is expressly prohibited (sect. 5201; 13 Stat. 110, sect. 35) from loaning money upon or purchasing its own stock, special authority is given for the acceptance of its shares as security for,

and in payment of, debts previously contracted in good faith; but all shares purchased under this power must be again sold or disposed of at private or public sale within six months from the time they are acquired.

Dealing in stocks is not expressly prohibited; but such a prohibition is implied from the failure to grant the power. In the honest exercise of the power to compromise a doubtful debt owing to a bank, it can hardly be doubted that stocks may be accepted in payment and satisfaction, with a view to their subsequent sale or conversion into money so as to make good or reduce an anticipated loss. Such a transaction would not amount to a dealing in stocks. It was, in effect, so decided in *Fleckner* v. *Bank U. S.*, 8 Wheat. 351, where it was held that a prohibition against trading and dealing was nothing more than a prohibition against engaging in the ordinary business of buying and selling for profit, and did not include purchases resulting from ordinary banking transactions. For this reason, among others, the acceptance of an indorsed note in payment of a debt due was decided not to be a " dealing " in notes. Of course, all such transactions must be compromises in good faith, and not mere cloaks or devices to cover unauthorized practices.

It is difficult to see how a debt due from, or a contested obligation resting upon, a bank, occupies any different position in respect to this power of adjustment and compromise from that of a debt owing to it. The object in both cases is to get rid of or reduce an apprehended loss growing out of legitimate business; and it would seem that whatever might be done in the one case ought not to be excluded from the other under the same circumstances. Often a discharge by a bank of its own obligation creates a debt due to it from another. Such was the case here. Bayne, without authority, transferred to the defendant, as collateral security for his indebtedness, a certificate of deposit issued to him by the plaintiff, and afterwards collected the money due upon the certificate from the plaintiff without disclosing the transfer. Any payment by the plaintiff to the defendant, therefore, in discharge of its liability upon the certificate, became a lawful charge against Bayne. He was insolvent. It was, on this account, not only the right, but

the duty, of the officers and agents of the plaintiff to protect by their arrangements, as far as possible, the stockholders whose interests they represented.   This was necessarily left to their judgment and discretion.   No question of good faith is involved. The transaction for all the purposes of this suit must be taken to have been, in fact, what it purports to be, — a fair and honest compromise of an outstanding claim, with a view to ultimate protection against an impending loss.   As such, we think it was within the corporate powers of the bank, and that the Court of Appeals did not err in so holding.

*Judgment affirmed.*