Architectural Decorating Company, Complainant and Appellee, v. Stacey J. Shaw and Ralph Sollitt and Sons Construction Company, Defendants. National Fowler Bank, Intervening Defendant. National Fowler Bank and Ralph Sollitt and Sons Construction Company, Appellants.

Gen. No. 36,822.

Heard in the second division of this court for the first district at the June term, 1933. Opinion filed March 6, 1934.

STEARNS & JONES, for appellant National Fowler Bank.

SANDERS, CHILDS, BOBB & WESCOTT, for appellant Ralph Sollitt & Sons Const. Co.; WILLIAM A. BRADFORD, of counsel.

ECKERT & PETERSON, for appellee; CHILTON P. WILSON, of counsel.

MR. JUSTICE GRIDLEY delivered the opinion of the court.

On September 14, 1931, complainant recovered a judgment in the circuit court of Cook county for $4,932.49, against Stacey J. Shaw on his judgment note. After execution had been returned "no property found and no part satisfied," and by virtue of section 49 of the Chancery Act (Cahill's St. 1931, ch. 22, ¶ 49, p. 244), complainant, on September 28, 1931, filed a creditor's bill against Shaw and the Ralph Sollitt & Sons Construction Co. (hereinafter called the Sollitt Co.) as defendants. Personal service was had upon the Sollitt Co., but none upon Shaw, who was a nonresident of Illinois. He did not enter his appearance and complainant made no attempt to obtain service upon him by publication or otherwise, and when subsequently the decree now in question was entered, following two reports of the master before whom there were somewhat lengthy hearings of evidence, the court, on complainant's motion, dismissed the bill as to Shaw, the judgment debtor. After the Sollitt Co. had filed its answer, the National Fowler Bank, organized under the laws of the United States and having its place of business at Lafayette, Indiana

(hereinafter called the Bank), obtained leave to file and filed an intervening petition, was made an additional party defendant, and subsequently filed its answer. The master's original report was filed on April 14, 1932. Subsequently, on complainant's motion, the cause was re-referred to him to take additional evidence, and on November 9, 1932, he filed a supplemental report. Both reports were favorable to complainant. The respective objections thereto of the Bank and the Sollitt Co. were overruled and ordered to stand as exceptions. After a hearing the court, on February 23, 1933, entered the decree, in which, after finding that said judgment had been entered against Shaw, that execution thereon had been returned unsatisfied, and that the judgment remained in full force and effect, the court further found in substance: That the Sollitt Co. "has in its possession, due under the contract between the Sollitt Co. and Shaw, the sum of $7,455.66"; that "there is due to complainant the sum of $5,739.75"; that "all of the material allegations of complainant's bill are proven and are true, and that the respective master's reports herein filed should be approved and confirmed"; and that "on or about July 16, 1931, the National Fowler Bank promised and agreed with Shaw that it, the Bank, *would pay and discharge the indebtedness* owing from Shaw to complainant, which indebtedness *was the indebtedness merged in the judgment* that was recovered against Shaw." And the court ORDERED and ADJUDGED:

That all exceptions to the first and second master's reports are hereby overruled.

That the bill is dismissed as to Shaw.

That the Sollitt Co. "pay to complainant or its solicitors within three days from this date the sum of $5,739.75, and in default of its so doing that execution issue."

That "complainant is entitled to recover from the National Fowler Bank the sum of $5,739.75, and judg-

ment is hereby entered and decreed against said Bank in said sum in favor of complainant, and that execution issue.''

That ''a payment by either party of a part or the whole amount due to complainant shall be credited as payment on the amount due from the other defendant.''

From the decree the Bank and the Sollitt Co. prayed and perfected their present appeal to this court. And they have here filed by their respective counsel a joint brief and argument, which has been answered by complainant's counsel, and the cause has been orally argued.

In complainant's bill it is alleged that it is filed ''because *of the collusion* between the defendants and the National Fowler Bank upon the facts hereinafter set forth''; that Shaw was a contractor and is a bankrupt; that the Bank claims to have loaned to him various sums of money to pay his debts and, by virtue of certain written assignments, to have the right of collection and recovery of certain of his accounts, credits and assets; that the nature of the assets or how much the Bank has realized because of the assignments are unknown to complainant; that Shaw is a subcontractor to furnish work and material for the construction of a new post office building at Milwaukee, Wisconsin; that the original contractor for the work with the Government of the United States is the Sollitt Co.; that under the subcontract Shaw has done work and furnished materials in large amounts for the building; that the Sollitt Co. either now owes or hereafter will owe to Shaw from time to time, on account of the subcontract, enough moneys to pay in full his indebtedness to complainant as evidenced by said judgment; that the Bank, ''*attempting to obtain a preference* and collect all moneys due to it from Shaw, procured from him, and forced him to give, *certain assignments and powers of attorney,* so that the Bank could collect all

moneys due to Shaw from any source, and so that complainant would not be able to recover any moneys due to it''; that the Sollitt Co. can only pay the moneys due to Shaw according to the terms of the subcontract, which contract complainant has never seen and is, therefore, unable to here set forth the provisions thereof; that complainant does not know what amounts of money are now due and will become due to Shaw, but ''is informed and believes and therefore states the fact to be'' that there is due or to become due from the Sollitt Co. to Shaw ''substantially the sum of $22,000''; and that both defendants, Shaw and the Sollitt Co., can disclose fully and particularly all facts as to the contract, the amounts due or to become due to Shaw, the said assignments and powers of attorney and the transactions between them.

The prayer of the bill is for a discovery, an accounting, and an injunction restraining the Sollitt Co. ''from assigning, transferring or paying out any moneys now due or hereafter to become due from it to said Shaw.'' And it is particularly prayed ''that Shaw may fully set forth and discover the nature, situation and amount of all the property and assets that he now has or has turned over or assigned to the National Fowler Bank; that he state whether he has any property or assets of any kind in Illinois or elsewhere; and that the Sollitt Co. may set forth an account of its contract with Shaw and the amounts due and to become due thereon.''

In the answer of the Sollitt Co., after denying many of the material allegations of the bill, it is alleged in substance:

That on August 27, 1930, Shaw, as a subcontractor, entered into a contract with it, whereby he agreed to furnish labor and materials, and to fully complete the lathing, plastering and stucco work for the post office building at Milwaukee, in accordance with certain

plans and specifications, for which it agreed to pay to him the sum of $52,500,—85 per cent to be paid as the work progressed subject to the approval of a named architect (contract to be produced on hearing); that after the execution of the contract and after Shaw had commenced the work, there was delivered to it (Sollitt Co.) a certain written assignment, "assigning all the funds due or to become due to Shaw under the contract to the National Fowler Bank," as follows: (Here is set forth the assignment, signed by Shaw and dated at Cincinnati, Ohio, on May 27, 1931, wherein mention is made of the subcontract, and of Shaw's indebtedness to the Bank "by reason of certain advancements by the Bank to him for the execution of said contract," and wherein it is stated that the Bank "may make further advances" for that purpose, and that, "in consideration of said advancements" made and to be made, Shaw "assigns to the Bank his rights . . . and subrogates to the Bank his rights and privileges under said contract"); that concurrently with the assignment there was also delivered to the Sollitt Co. a written power of attorney, constituting and appointing the Bank the attorney of Shaw, signed and acknowledged by Shaw under date of July 16, 1931. (Here is set forth the power of attorney wherein the Bank is authorized by Shaw, in his name and stead, "to conduct and carry on the business of executing and completing certain contracts," which Shaw then held, "for the lathing and plastering of various buildings, including the U. S. Post Offices and Court Rooms at Milwaukee, Wisconsin, El Dorado, Arkansas, and Baltimore, Maryland"; also various other contracts theretofore made by him and not yet completed; and the Bank is further authorized to execute and deliver in Shaw's name "all instruments in writing, necessary to the proper conducting of the business, as the Bank may deem necessary and expedient"; and it is further

stated that the power of attorney, so given, is "to be irrevocable so long as there remains any indebtedness" from Shaw to the Bank.) And in the answer it is further alleged that "prior to the service of summons" upon the Sollitt Co., it "had paid to the Bank, by virtue of the assignment, all amounts then due under said contract, totaling $40,797.22," and that the work has not yet been completed and that "there are now no funds owing to Shaw in the hands of defendant" (Sollitt Co.). And in the answer it is admitted that "the Bank claims that it is entitled to receive all funds due and to become due under the terms of said contract."

In the answer of the Bank there are similar denials and allegations. And the Bank denied that any collusion between it and Shaw had been practiced, or that it was guilty of any fraud in procuring the assignment of Shaw's subcontract to it; alleged that the moneys for labor and materials for the Milwaukee post office building "had been furnished by this defendant (the Bank), and that the amounts expended by it in the performance of said sub-contract *are in excess of all amounts* which have been or will be received by it on or because of the contract, and that it has suffered a loss in the performance of said sub-contract, so assigned to it." To this answer, and to the answer of the Sollitt Co., complainant filed replications.

On the hearings before the master, Rudolph F. Schmidt, president of complainant, testified in its behalf, and it called as witnesses Ralph D. Reser and Mark L. Thompson, residents of Lafayette, Indiana, and respectively the cashier and attorney at law for the Bank. Thompson gave further testimony as a witness for the Bank, and various documents, agreements and other writings were introduced in evidence. On the second hearing before the master it was stipulated

and agreed that if George Sollitt were called as a witness he would testify in substance as follows:

That the Sollitt Co. entered into the subcontract with Shaw for Shaw's doing the plastering, etc. work on the post office building at Milwaukee and at the contract price of $52,500; that certain extras and additions to the contract were made, making the total contract price, including extras, $59,000; that there has been paid on account of the contract and extras $49,039.50; that there remains due to various subcontractors the sum of $2,504.84; and that "the balance remaining in the hands of the Sollitt Co., as of this date (about October, 1932), is $7,555.66, which balance is claimed by the National Fowler Bank, by virtue of the assignment to it by Shaw."

One of the contentions of appellants' counsel, as a ground for the reversal of the decree, is that it does not conform to the theory of the bill as disclosed from its allegations. And counsel argue in substance that the bill (which was never amended) charges that because of the collusion and fraud of Shaw and the Bank, Shaw's assignment of his subcontract to the Bank was void as to complainant, the judgment creditor of Shaw; that the decree discloses that the court granted relief to complainant on an entirely different theory (viz., that about the time the assignment was executed the Bank "promised and agreed with Shaw that it would pay and discharge the indebtedness owing by Shaw to complainant"); that there are no allegations in the bill charging that the Bank made any such promise or agreement with Shaw; that, furthermore, the bill does not pray for any specific relief against the Bank; and that, hence, the bill should have been dismissed. We are of the opinion that there is substantial merit in the contention and argument. In *Howard v. Burns,* 279 Ill. 256, 260, it is said: "The allegations of a bill, the proof and the decree must correspond, and relief

cannot be given upon facts proved by the evidence where there are no averments in the bill to which the evidence can apply.'' (See, also, *Morgan v. Smith,* 11 Ill. 194, 200; *Bremer v. Calumet & Chicago Canal & Dock Co.,* 123 Ill. 104, 110; *Leahy v. Nolan,* 261 Ill. 219, 221, 222; *Tucker v. Powell,* 318 Ill. 166, 168.) In the *Bremer* case it is said: ''Nothing is better settled than that proofs without allegations are just as unavailable as allegations without proofs.'' And in the *Tucker* case it is said: ''If the allegations in a bill are not established by the proof, or if the proof establishes a state of facts not alleged in the bill and no amendment of the bill to correspond with the proof is made, the chancellor cannot do otherwise than enter a decree dismissing the bill.'' Furthermore, it is well settled that ''the decree must conform to the prayer of the bill.'' (*Hall v. Towne,* 45 Ill. 493, 495; *Gage v. Curtis,* 122 Ill. 520, 527; *Warner v. Mettler,* 260 Ill. 416, 422.)

And, in our opinion, there is merit in appellants' counsels' contention, as a ground for a reversal of the decree, that it is well settled law that an assignment of the assets by an insolvent debtor to a bona fide creditor, as security for or in payment of said creditor's claims is neither necessarily fraudulent nor void as to the debtor's other creditors, even though the effect of said assignment be to hinder and delay said other creditors in the collection of their claims. (See *First Nat. Bank of Peoria v. Rhea,* 155 Ill. 434, 440; *Walsh v. O'Neill,* 192 Ill. 202, 205; *Third Nat. Bank of Mt. Vernon v. Norris,* 331 Ill. 230, 233, 234; *Levy v. Weidhorn,* 287 Fed. 754, 756, 757.) In the *Norris* case, it is said: ''The conveyance was a preference of the $10,000 debt over E. J. Norris' other debts, but a debtor has a right to prefer one creditor, when he acts without fraud, even though he devotes all his property to the preferred creditor, leaving nothing for his other cred-

itors to resort to. There must be evidence to show a fraudulent intent before a conveyance made upon a valuable consideration may be held fraudulent.'' The evidence in the present case discloses in substance that at the time (May 27, 1931) when Shaw made the said assignment to the Bank, he was actually indebted to it for moneys loaned to him for the purpose of financing various construction projects in the sum of approximately $26,000, as evidenced by certain of his notes held by the Bank, and that he was unable to pay the notes; that the assignment was made by Shaw and taken by the Bank, in good faith and without any intention of defrauding any of Shaw's other creditors, *as security* for Shaw's existing indebtedness to the Bank, and *also as security* for additional moneys that the Bank would expend in Shaw's behalf in the carrying out of his subcontract on the Milwaukee post office job; and that about the time the assignment was made Schmidt, president of complainant, had knowledge of its execution and purport. It amounted to a preference to the Bank over Shaw's other creditors including complainant, and might have been set aside as such by proceedings in a bankruptcy court had complainant and some of Shaw's other creditors seen fit in apt time to institute such proceedings, but the evidence does not disclose that any bankruptcy proceedings were instituted.

It is further contended by appellants' counsel in substance that the court's finding in the decree (viz., that about July 16, 1931, the Bank ''promised and agreed with Shaw that it would pay and discharge the indebtedness owing from Shaw to complainant'') is contrary to the evidence, and that the decree, based upon such a finding, is also contrary to the evidence and should be reversed. We are of the opinion that there is merit in the contention. The evidence, pertinent to the contention, disclosed the following facts in

substance: About July 16, 1931, Thompson (the lawyer and representative of the Bank), Schmidt (president of complainant), and Shaw had various conferences in Cincinnati, Ohio, concerning the condition of Shaw's business affairs. Thompson was looking after the Bank's interests and Schmidt was attempting to have adjusted Shaw's indebtedness to complainant, which is the indebtedness for which it subsequently obtained the judgment against Shaw. On July 16, 1931, Thompson gave to Shaw a letter, signed by the Bank, per himself (Exhibit 2-0), in which he recommended one of two alternatives that would have to be pursued by Shaw because of existing conditions, viz., (1) either assigning *all* of his contracts on various uncompleted jobs to the Bank, in order to secure it, he to be paid his expenses and a weekly salary by the Bank, etc., and the Bank to "make satisfactory arrangements" with complainant "to absorb and discharge" Shaw's indebtedness to complainant, or (2) a receivership over Shaw's business and assets. Apparently, Shaw accepted the first alternative and appropriate actions were taken. Apparently, also, Schmidt had voiced objections at the conferences to the Bank's getting assignments of *all* of Shaw's contracts unless some provisions were made for the payment or security of Shaw's said indebtedness to complainant. Because of Schmidt's objections, a written agreement, dated July 16, 1931, was drafted (Exhibit 6), and signed by complainant (per Schmidt) and the Bank (per Thompson). It is recited in the agreement that Shaw is indebted to complainant in the sum of $4,584, as evidenced by his note; that Shaw is indebted to the Bank in the sum of about $47,000; and that Shaw "has executed an assignment and a complete power of attorney" to the Bank "upon *all* the contracts now in existence." It is then provided that complainant agrees to co-operate with and assist the

Bank "in determining the advisability of proceeding on each of the contracts," and to "assist, in an advisory capacity, in the execution of such contracts as may now be in process of execution," and to "furnish such technical advice and supervision as is necessary or possible"; and that, in consideration thereof, the Bank "agrees to guarantee payment of such indebtedness as is evidenced by said note in full on or before date of final completion and termination of the said Shaw contracts." *But,* on the face of the agreement it is further stated that it is *"subject to the approval of the officers of the corporation"* (i. e., the Bank). Shortly after the signing of the instrument at Cincinnati, Thompson and Schmidt went to Lafayette, Indiana, and interviewed the officers of the Bank, but *they refused to approve the agreement or to sign it.* There is no evidence that Thompson had authority, in signing the agreement, to bind the Bank by the terms thereof, without the affirmative approval of the Bank's officers which was not obtained. Nor is there any evidence that complainant ever "co-operated" with the Bank as it agreed to do or that the parties ever acted as if the agreement was in force. Thereafter the Bank, by Shaw and other agents, continued to prosecute Shaw's subcontract on the Milwaukee post office building to substantial completion and advanced additional moneys for the purpose. At the end it appeared that in the prosecution of said subcontract the Bank had expended, out of its funds, a total of approximately $66,000,—a sum in excess of the total amount, including extras, of the contract price.

And we find no merit in appellee's counsels' contention, as we understand it, that the decree may be sustained on the theory that the Bank, in taking the assignments and powers of attorney executed by Shaw and prosecuting and completing his Milwaukee subcontract, was guilty of ultra vires acts. We do not

think that its acts can be considered as ultra vires the bank. (*Roebling Sons Co. v. First Nat. Bank of Richmond, Va.*, 30 Fed. 744, 746; *First Nat. Bank of Charlotte v. National Exchange Bank of Baltimore,* 92 U. S. 122, 127; *Paterson & Edey Lumber Co. v. Bank of Mobile,* 203 Ala. 536, 540.)

Our conclusions are that the court erred in entering the decree appealed from and that the court should have dismissed complainant's bill. Accordingly, the decree is reversed and the cause is remanded to the circuit court with directions to dismiss the bill for want of equity.

*Reversed and remanded with directions.*

SULLIVAN, P. J., and SCANLAN, J., concur.