The appellant, Riteway Machine Manufacturing Company, Inc., has appealed from a judgment of the trial court granting a motion for a directed verdict made by the appellee, The First National Bank of Tuscumbia. We reverse.
The facts of this case, briefly stated, are as follows: The appellant is a company which manufactures and repairs equipment used in sawmills. The appellant had made repairs on certain sawmill equipment for All-Products, Inc., in Sheffield, Alabama. Because of the difficulty which the appellant had experienced in collecting for previous repairs, in April or May of 1976, the appellant refused to perform any more repairs for All-Products.
It appears from the record that All-Products was in serious financial trouble; its plant and equipment were in a state of disrepair and All-Products was indebted to *Page 1363 
the appellee, First National Bank of Tuscumbia, in the amount of $212,000. Although the appellant originally refused to repair any more equipment for All-Products, certain repairs worth approximately $12,000 were eventually made by the appellant.
The crux of the appellant's claim is that these repairs were made because the appellee, acting through its vice-president, Troy "Dutch" Maxwell, assured the appellant that the repair bills would be paid by the bank. When the bills were not paid, the appellants filed this action against All-Products and Maxwell. The appellee bank was added as a defendant in an amended complaint. The appellant sought $12,913.69 in a three count complaint: work and labor; goods sold and delivered; and open account.
The record does not reflect that All-Products was ever served with the summons and complaint in this case; indeed, the evidence adduced at trial indicates that All-Products has discontinued its operations altogether. After the appellant presented its evidence, defendant Maxwell made a motion for a directed verdict which the trial court granted. The appellee also moved for a directed verdict at this point, but the trial court denied this motion. After all the evidence was presented and both sides had rested, the appellee renewed its motion for a directed verdict and the trial court granted that motion. The trial court subsequently overruled the appellant's motion for a new trial, hence this appeal.
The record does not indicate the specific grounds upon which the trial court relied in granting the appellee's motion for a directed verdict. However, viewing the tendencies of the evidence in a light most favorable to the non-moving party,Beloit Corp. v. Harrell, 339 So.2d 992 (Ala. 1976), and in accordance with the scintilla rule, Rule 50 (e), ARCP; Loeb andCo., Inc. v. Martin, 295 Ala. 262, 327 So.2d 711 (1976); we believe that the trial court erred in directing a verdict in favor of the appellee in this case.
The counsel for the appellee stated three specific grounds in support of the motion for directed verdict: failure to prove a prima facie case, the defense of ultra vires and the Statute of Frauds.
With respect to the first two grounds noted above, we are not persuaded that the trial court was justified in directing a verdict for the appellee based on the evidence in the record. The appellant presented evidence which, if believed, would have permitted the jury to find that the appellant, Riteway, performed the repairs and extended credit therefor based on the express assurances of "Dutch" Maxwell, the vice-president of the appellee bank, that the bank would assume responsibility for the repair bills.
 Direct Examination of Wesley Eugene Clark:
Q. For the record, state your name.
A. Wesley Eugene Clark.
Q. Where do you reside?
A. Route 5, Box 307, Pell City.
Q. Where are you presently employed?
A. Riteway Machine Manufacturing Company.
Q. What is your position at Riteway?
A. Vice-President.
Q. How long have you been in that position there at Riteway?
A. Two years.
Q. Do you recall having an occasion to deal with Mr. Dutch Maxwell in your capacity as Vice-President of Riteway Machinery?
A. Yes.
Q. When was that?
A. Latter part of May . . . latter part of April or first part of May, 1976.
Q. During the first part of May, 1976, were you, at that time, a Vice-President of Riteway Machinery?
A. Yes.
* * * * * *
Q. While you were up there on this trip, did you have an occasion to go out and look at the mill and make recommendations to the people there? *Page 1364 
A. I had a look at the mill, but at this time, I did not make any recommendations to them because I had such a bad payment record with them, that I told them that unless somebody came up with a good solid pay program, that I would not do anything else for them.
Q. Did they respond to that?
A. Yes, sir.
Q. What was the response?
A. This is when they came back and I first ran into Mr. Dutch Maxwell and was informed that the bank was now in the process of taking over . . . or had taken over the mill or their funds, and he had the approval or disapproval of everything that went on.
Q. Who told you that?
A. Jim Works.
Q. Was this on the occasion that you were up there in April or May of 1976?
A. Yes.
Q. Now after they told you it had to have Dutch Maxwell's approval, what else happened?
A. They telephoned Mr. Maxwell and he came over. I met him for the first time, and of course, I let him know who I was, and he let me know who he was . . . that he was an officer of the bank there at Sheffield. At that time, I didn't know if it was First National or which bank.
Q. Did he introduce himself as an officer of the Bank?
A. I can't recall if he introduced himself, or if he was introduced as . . . in fact, I am sure Jim Works introduced us to each other.
* * * * * *
Q. Did you discuss on that occasion who would be responsible for the payment of this indebtedness?
A. Yes, sir, I mentioned the fact to Mr. Maxwell of the past pay record of the people, and we would not do anything until we were assured we would be paid. At this time, I was assured he was in charge and we would be paid by his outfit, his bank. In other words, the bank was in charge of all operations, approvals and expenditures at this time.
Q. Did you have any further conversation at that time with Mr. Maxwell about the payment of the obligation of the work y'all were going to do?
A. On that visit, we did not.
* * * * * *
Q. Was Mr. Maxwell there in this second visit?
A. Yes.
Q. After you went over the plans and specifications of what it was going to cost and what you were going to do to put the mill back in order, did you have any discussion about payment of the bill?
A. Yes, we did. As we laid it out as to the stages we were going to do it in, we requested at that time, that we be paid upon completion of each segment because we were not large enough yet to finance them through the whole thing for the total bill. We were assured by Mr. Maxwell that we would be paid upon completion of each job . . . or each portion of that job.
Q. Did anybody advise you as to what Dutch Maxwell's position was with All-Products?
A. I was told before I met him . . . and after I met him, he was introduced as being from the bank, and also in his conversation, he stated that the bank was in charge of the place. We point-blank asked him . . . or Mr. Rogers did at this meeting when we laid the plans out, just what his position was. We had heard some vibes that All Products was not so sound and we were assured that we would be paid and that the bank was in charge.
Q. Who did that assurance?
A. Mr. Maxwell. We felt that we couldn't go wrong doing work for a bank.
Q. And when you asked him [Mr. Maxwell] about the receivorship [sic] at the meeting, what did he say on that occasion?
A. We were assured that the bank was behind All-Products. We were answering *Page 1365 
to them and they were approving the work, and in turn, they were going to see that we got paid.
Mr. Troy "Dutch" Maxwell was called by the appellant as an adverse witness, Rule 43 (b), ARCP. The following information was elicited.
 Direct Examination of Troy Maxwell:
Q. State your name.
A. Troy Hamner Maxwell.
Q. Are you also known as Dutch Maxwell?
A. Right.
Q. Back in April of 1976, where were you employed?
A. I was Vice-President and Branch Manager of the Sheffield Branch of the First National Bank in Tuscumbia.
Q. Vice-President and Branch Manager of the First National Bank of Tuscumbia?
A. Sheffield Office.
Q. Back in that period of time, were you familiar with a company known as All-Products Company, Incorporated?
A. Yes, I was.
Q. When did you first become familiar with them?
A. As far as First National Bank, it was November of 1974.
Q. November of 1974?
A. Yes.
Q. Was All Products Company, Inc., a customer of the First National Bank of Tuscumbia, Sheffield Branch?
A. No, they were a customer of the Muscle Shoals Branch when I came to the bank in November of 1974 . . . when I came to the Sheffield Office, they were already a customer of the Muscle Shoals branch.
Q. Did they later start transacting their business with the Sheffield Branch?
A. No, the Chairman of the Board of the Bank and the loan officer of the Muscle Shoals Office thought it better that this loan of this company be worked out in the Sheffield Office, so it was moved to the Sheffield Office.
* * * * * *
Q. Who were you directly answerable to?
A. When I first came to the Sheffield Office, I was directly answerable to John Brignett. I never did understand why he was Chairman of the Board. Later, it was switched, and I was directly answerable to Mr. Johnson, who is President here and was Chief Executive Officer of the bank.
Q. That is Mr. Ed Johnson, the gentleman seated over here?
A. Yes.
Q. To your knowledge, is he the president of First National Bank of Tuscumbia?
A. Yes.
Q. Was he in April of 1976?
A. Yes, sir.
Q. Going back to All Products Company, did they have a loan outstanding with your bank at that time?
A. Yes, sir, they did.
Q. Do you recall the amount of that loan at that time?
A. It was an installment loan that started out as $160,000.00 and with interest, it was $212,000.00.
Q. What was the arrangement with regard to their continuing to operate . . or what was the arrangement with your bank?
A. Are you talking about at the conception of the loan, or are you talking about . . .
Q. In April of 1976.
A. At that time, they were in pretty serious financial position as far as repayment of the loan and as far as payment of some of their payable.
Q. Account payables? [sic]
A. Yes.
Q. People that they owed?
A. Yes. *Page 1366 
Q. Did the bank have any special conditions upon which All Products could work with regard to paying Accounts Payable or check writing or anything of that nature?
A. You have asked about five questions in one there.
Q. All right, let me see if I can break it down. At the time in April, 1976, who was signing the checks with All Products?
A. At the direction of the Chairman of the Board of the First National Bank, Mr. John F. Brignett, I was told to counter-sign the checks; the checks would be brought to the bank at Sheffield by Stanley Huffaker, the accountant, and they would be checked over to see if there was any possible graft. This was a problem that has preceded this decision to keep down any stealing within the company. Mr. Howard Roberts, the guarantor of the whole loan and Mr. Brignett met together and they required that I counter-sign these checks.
Q. When did you take on this responsibility of counter-signing the checks of All Products?
A. I don't know whether it was February, March or April of 1976, but it was within that period.
Q. How long did this arrangement exist?
A. From March through July.
Q. March through July of 1976?
A. Right.
Q. Do you recall meeting with Mr. Wes Clark, the gentleman seated to my left here?
A. Yes, sir.
Q. On how many different occasions did you meet with Mr. Clark?
A. Actually meeting, maybe two or three times; but seeing and talking to him, it would have been a good dozen times.
Q. Were you in daily contact with the daily operations of All Products?
A. I either stopped by there in the morning going to the bank, or coming home, or either at noon.
* * * * * *
Q. Do you recall in what capacity you were introduced to Mr. Clark?
A. We are talking about two years ago . . . it could have been . . . I did meet Wes Clark first, and at the second meeting, Dave Rogers was there. At that time, Dave Rogers told me he was in a consulting type capacity in trying to help Wes Clark look at what was wrong, and make diagrams of it or drawings of it. I asked him what he did, and he said he was employed, but because he was on physical disability, he could not draw money.
Q. Did Mr. Clark eventually go to work at All Products?
A. Yes, sir. He did start that first work on the chip mill and he stayed there possibly ten days . . . he did do that work.
Q. Did you authorize him on that occasion to do that work?
A. Well, lets go back . . . as I said, Mr. Howard Roberts guaranteed this loan at the bank. Because of the financial situation that the company was in, Mr. Roberts and Mr. Brignett both agreed that there needed to be some outside investments to come in and help pull this thing out. At that time, I did go out with the records of All Products made by Stanley Hufaker, as far as projections, and I did solicit for the investments from about nine people. I think two of them did come out and see Mr. Clark at that time. This was to add capital to the company and to put in new equipment and get this thing going and to try to pull Mr. Roberts' losing situation out.
Q. Back at this time, were you in daily contact with the main branch over in Tuscumbia?
A. I am not sure whether we were meeting three mornings a week or two mornings a week . . . it was three or four days a week that I was there either in the morning or afternoon. I didn't miss many days.
Q. And Mr. Johnson was present at that time?
A. Yes, sir. *Page 1367 
Q. Did he conduct these meetings?
A. Unless he was out of town, and then the Cashier of the bank . . . well, at that time, Mr. Noel Moore was Executive Vice-President, and he carried it on.
Q. Did you ever discuss with Mr. Johnson the operations there at All Products?
A. There were quite a few discussions in loan committee meetings, in past due meetings; and Mr. Johnson did on several occasions let me know that we had to get this thing straightened out because of the severe overdrafts, and because of lack of payments on the monthly note payments. As a banker, I was out there trying to get the thing back on its feet.
Q. That was when you were dealing with Mr. Wes Clark who was up there trying to get this machinery in a shape where it could produce?
A. Yes.
* * * * * *
Q. Did you go over the plans and specifications that were submitted by Mr. Clark with regard to the repairs or making these machines work?
A. At that time, All Products had a maintenance supervisor by the name of David Hale. He went over them thoroughly because I do not read drawings and plans very well. I said, "Is that what you are talking about?" And he said, "Yes." I saw them . . . I looked at them, but I couldn't tell you anything technically about them. I don't know that much about drawings and plans.
Q. What was the purpose of your being there at that meeting?
A. In a capacity on behalf of the bank to see that they did get going so that the bank might realize some of their loss from the poor management of All Products in the past.
Q. Did the bank take a loss on this?
A. Yes, sir.
Q. Is it a fact that the Board of Directors of the First National Bank of Tuscumbia authorized you to do whatever was necessary to bail this company out?
A. The Chairman of the Board of the First National Bank, John Brignett, told me to get out and do whatever was in reason to try and get this thing out of the bank . . get this loan paid off. Then we discussed the potential of getting some new investors which he said, "Go get it"; and Mr. Roberts said to go after it. We actually thought we had done it, until some of them backed out.
Q. Did you feel, in April of 1976, after discussion with Mr. Clark and Mr. Rogers that the work that they had proposed to be done to that plant was necessary to get that plant back in operation?
A. The maintenance manager, Jim Works, and I don't know if Stanley was in on that or not . . . both said it was direly needed to make the plant run. Mr. Roberts was well aware of it; he had been out there and he knew it had to be done, so he said for us to go ahead.
The only witness who testified for the appellee was Mr. Edmond Johnson, the President and Chief Executive Officer of the First National Bank of Tuscumbia. His testimony was to this general effect.
 1. He did not recall that the board of directors ever authorized Mr. Maxwell to act in any capacity for All-Products on behalf of the bank.
 2. He, as chief executive officer of the bank, did not authorize Mr. Maxwell to act in any capacity with All-Products Company.
 3. He never gave Mr. Maxwell authority to represent the bank in "standing good" for anybody's debts.
 4. The board of directors and the executive committee of the bank were not aware of All-Products' serious financial condition until shortly before All-Products ceased operations.
 5. He, as chief executive officer of the bank, did not know that Mr. Maxwell had been authorized to counter-sign checks drawn on All-Products' account. When he found out about Mr. Maxwell's counter-signing these checks, he brought it to the attention *Page 1368 
of the board of directors, and the board decided that this procedure should be stopped.
 6. Mr. Maxwell made loans to All-Products without informing the loan committee or the bank's board of directors.
On rebuttal, Mr. Clark testified unequivocally that when Riteway agreed to make these repairs at All-Products' plant, the credit therefor was extended to Dutch Maxwell and the bank. Mr. Maxwell was also called by the appellant in rebuttal; he testified that the security agreement between All-Products and the bank allowed the bank to monitor and require current statements "and if anything was real past due, it [the bank] could step in and try to correct that." Mr. Maxwell then stated that, in essence, the bank did step in because "we were working to try to get this thing going so the bank could be repaid."
We have reviewed the entire record and we have found nothing therein which would justify a directed verdict for the appellee on the grounds of failure to prove a prima facie case or ultra vires.
A cursory view of the general law in this area is illustrative. In 10 Am.Jr .2d, Banks, § 99, the rule is said to be that the power of an officer or agent of a bank to bind the bank includes both actual and apparent authority.
. . . Officers of a bank are but its agents and, like other agents, can bind the bank only when acting within the scope of their authority; but when a bank opens its doors for business with the public and places officers in charge, persons dealing with them in good faith and without any notice of any want of authority will be protected where an act is performed in the apparent scope of the officer's authority, whether the officer is actually clothed with such authority or not. Moreover, it is immaterial what the person's official position may be if he is actually engaged in the management of the bank's interests. Indeed, when the bank holds out even a minor official as being entrusted with certain powers and duties, his acts within the scope of such apparent powers are binding on the bank. If a bank does not wish the public to deal with any particular one of its officers at the regular place of business in a particular line of that business, it is its duty so to notify the public in some effectual way.
 Executive officers of a bank are presumed to have acted within the scope of their authority until a contrary showing is made. [Footnotes omitted.]
We are of the opinion that a jury question was presented as to whether Mr. Maxwell was acting within the scope of his authority.
We are not convinced that the appellee established as a matter of law, that its alleged actions were ultra vires. The appellee did not present any direct evidence as to the scope and breadth of its powers; therefore it is difficult, if not impossible, to conclude whether its activities were within its enumerated powers as set out in its charter or the appellate statutes. We do note that 12 U.S.C.A. § 24 (7) provides that national banks have "all such incidental powers as shall be necessary to carry on the business of banking. . . ."
In Paterson Edey Lumber Co. v. Bank of Mobile, 203 Ala. 536,84 So. 721 (1919), this Court addressed the question of whether the National Bank of Mobile had the power to make a contract for the sale of lumber which the bank had received as payment on certain notes. This Court noted that
. . . [t]he primary powers of defendant corporation for the carrying on of a banking business consisted of discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt, receiving deposits, buying and selling exchange, coin, and bullion, loaning money on personal security, and obtaining, issuing and circulating notes, according to the provisions of the acts of Congress. Implied power in the collection of its debts authorized that corporation, where necessary and in good faith, to acquire real and personal property *Page 1369 
in such collection. Having due regard for the rights of its stockholders, depositors, and the general public, its said implied duty and power were, not only to preserve the property taken in the collection of its debts, but reasonably to fit it for, and place it upon, the market in its conversion into money in payment of the debt for which said property was acquired. Defendant was attempting to do no more than this in making the sale to Paterson-Edey Lumber Company, by contracting for and making the lumber conform to purchaser's specifications. This was not the engaging in a milling business by the Bank of Mobile beyond its charter powers; it was an action necessarily incident to the collection of its debt, on which the lumber in its original form was taken. This may be done, under the federal authorities. [Citations omitted.]
203 Ala. at 540, 84 So. at 724.
With reference to the incidental powers granted to a national bank, it was stated that
 [t]hese powers are such as are required to meet all the legitimate demands of the authorized business, and to enable a bank to conduct its affairs, within the general scope of its charter, safely and prudently. This necessarily implies the right of a bank to incur liabilities in the regular course of its business, as well as to become the creditor of others. Its own obligations must be met and debts due to it collected or secured. The power to adopt reasonable and appropriate measures for these purposes is an incident to the power to incur the liability or become the creditor. Obligations may be assumed that result unfortunately. Loans or discounts may be made that cannot be met at maturity. Compromises to avoid or reduce losses are oftentimes the necessary results of this condition of things. These compromises come within the general scope of the powers committed to the board of directors and the officers and agents of the bank, and are submitted to their judgment and discretion, except to the extent that they are restrained by the charter or by-laws. Banks may do, in this behalf, whatever natural persons could do under like circumstances.
203 Ala. at 539, 84 So. at 729, quoting First Nat. Bank v. Nat.Exchange Bank, 92 U.S. 122, 127, 23 L.Ed. 679 (1895).
To like effect, it is stated in 10 Am.Jur.2d, Banks, § 286, that
 [a]lthough the general rule is that a bank cannot operate an alien business, a different situation is presented in instances where the bank is forced, in order to realize on an obligation owing it and in order not to suffer a loss of its assets, to acquire or dispose of property securing the debt or to operate a business so as to realize the repayment of an obligation owing the bank. The exact limits of the power of a bank which, being a creditor, becomes possessed of property or property rights in various forms as security, to do acts in the management or improvement of such property or development of such rights in order to render them valuable to the end, in good faith, of thereby securing liquidation of the debts to it, are quite indefinite, and doubtless public policy requires that a bank, like an individual, should have broad powers in regard to the exercise of discretion and judgment to the end that property or rights so held as security be rendered as valuable as possible so that it may not lose that which it ought to collect.
This Court has also stated that the phrase
. . . "necessarily incident to the powers for carrying out the objects of the charter" was not
intended to indicate that the acts should be "indispensably necessary to the purposes of the corporation, but only that they should be necessary in the sense of being appropriate and suitable for the purposes for which the corporation was organized."
Cadden v. Ladd, 358 So.2d 437 (Ala. 1978) at 439, quotingPaterson Edey Lumber Co., supra.
Absent direct evidence indicating that the actions of the bank in the instant case were clearly beyond its express or implied *Page 1370 
powers, we cannot hold that these actions were not "appropriate and suitable" for the protection and security of the appellee's investment in All-Products.
It is not necessary for our decision in this case to determine the effect, if any, of Code 1975, § 10-2-169 on these transactions. In this regard, see First National Bank of Auburnv. Dowdell, 275 Ala. 622, 157 So.2d 221 (1963); InternationalDairy Queen, Inc. v. Bank of Wadley, 407 F. Supp. 1270 (M.D.Ala. 1976).
Turning to the final issue of whether the bank's liability to the appellant is barred by the Statute of Frauds, Code 1975, §8-9-2 (3), we agree with this statement contained in the brief of the appellant:
. . . [W]here services are performed upon the promise to pay by one other than the recipient, the issue of the Statute of Frauds is for the jury's determination. . . . [T]he crucial issue to be determined is to whom the credit was extended which requires a look at the intention of the parties. This issue has been universally held by this Court to be a question of fact for the jury's determination and when deciding the question, they should take into consideration the extent of the undertaking, the expressions used, the situation of the parties and all the surrounding circumstances.
Code 1975, § 8-9-2 (3) provides generally that every special promise to answer for the debt, default, or miscarriage of another is void unless it is written. As was noted in Boykin McRae v. Dohlonde Co., 37 Ala. 577 (1861), the determinative inquiry is to whom did the promisee extend the credit. If the promisee extended credit to the promisor, then the promisor is not being asked to answer for the debt of another, and it is immaterial that the goods were delivered to or the services were performed for someone other than the promisor. If that be the case, then the requirement that the promise be written is not applicable.
. . . [I]t is impossible to specify any one fact, or set of facts, on which the question to whom the plaintiff gave credit, is to be determined; and the weight to which any particular fact may be entitled, must vary with the varying circumstances with which it may be found connected. Consequently, when there is any conflict of evidence upon the subject, the weight to be given to any particular circumstance should be left to the jury, who, in deciding the question, to whom the credit was given, should take into consideration "the extent of the undertaking, the expressions used, the situation of the parties, and all the circumstances of the case." [Citations omitted.]
37 Ala. at 584.
Having reviewed the evidence, we are convinced that the appellant presented at least a scintilla of evidence that the credit was extended to the appellee instead of to All-Products. The trial court was therefore precluded from taking this question from the jury. Boykin McRae, supra; Schiffman v.H.L. Raburn Co., 47 Ala. App. 390, 255 So.2d 332 (1971); Dayv. Adcock, 11 Ala. App. 471, 66 So. 911 (1914).
For the reasons stated above, this case is due to be and is hereby reversed and remanded to the trial court for further proceedings in a manner consistent with the views expressed herein.
REVERSED AND REMANDED.
BLOODWORTH, FAULKNER, JONES, ALMON and EMBRY, JJ., concur.